UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER JONES,<br><br>                              Petitioner,<br><br>v.<br><br><br>MATTHEW CATE,<br><br>                              Respondent. | Case No.:  3:09-cv-01896-JM (MSB)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

        This Report and Recommendation is submitted to the Honorable Jeffrey T. Miller, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.

## PROCEEDINGS

        On August 28, 2009, Petitioner Christopher Jones (hereafter "Petitioner" or "Jones") filed a pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 directed to his 1995 second degree murder conviction in San Diego Superior Court.  (ECF No. 1.) Ultimately, the District Judge adopted the then-assigned Magistrate Judge's Report and Recommendation granting Respondent Matthew Cate's (hereafter "Respondent") motion to dismiss the Petition as time-barred.  (ECF No. 116.)  However, the District Judge granted

a Certificate of Appealability with respect to the issue of Petitioner's entitlement to equitable tolling. (Id. at 6.) On January 22, 2015, the Ninth Circuit reversed in a Memorandum Decision. It held that Petitioner was entitled to equitable tolling based on his history of mental impairment. Jones v. Cate, 590 F. App'x. 701 (9th Cir. 2015); (see also ECF No. 127).

On remand, Petitioner (through appointed counsel) filed a First Amended Petition for Writ of Habeas Corpus ("FAP") on January 16, 2016, in which he alleged two ineffective assistance of trial counsel claims and an instructional error claim.[1] (ECF No. 141.)[2] Petitioner conceded that his two ineffective assistance claims had not been presented to the state courts. (Id. at 8.) Petitioner contended, however, that the two claims technically were exhausted since requiring him to return to state court on claims that were procedurally barred would be futile. (Id. at 35.) He further contended that, although the claims were procedurally defaulted, he could overcome the procedural default by establishing cause and prejudice. (Id. at 34-39, 46.) In the alternative, Petitioner asserted that if his ineffective assistance claims were deemed unexhausted, the Court should grant a stay so that he might present the claims to the state courts. (Id. at 48-51.)

On March 10, 2016, Respondent filed a Motion to Dismiss the FAP for failure to exhaust state remedies with respect to the two admittedly unexhausted ineffective assistance claims. (ECF No. 144.) Respondent stated, however, that he did not oppose Petitioner's request for a stay in order to exhaust his state remedies with respect to those claims. (ECF No. 144-1 at 16.) In the alternative, Respondent contended that the new

---

[1] Petitioner conceded that his instructional error claim fails on the merits because the United States Supreme Court rejected the identical argument concerning the identical jury instruction in *Middletown v. McNeil*, 541 U.S. 433 (2004). (See ECF No. 141 at 47-48.) Accordingly, the Court is not addressing that claim in this Report and Recommendation.

[2] Citations to the FAP refer to the pagination generated by the Court's electronic case filing system. Attached to the FAP were four exhibits, marked as Exhibits A-D. These exhibits hereinafter will be referred to as "FAP Exh. --".

ineffective assistance claims should be dismissed for untimeliness.  (See id. at 17-22.)  On April 6, 2016, Petitioner filed his Opposition to Respondent's motion.  (ECF No. 146.)

On September 20, 2016, the Court issued a Report and Recommendation in which it recommended (a) the denial of Respondent's Motion to Dismiss the two ineffective assistance claims for untimeliness and (b) the granting of Petitioner's unopposed request to stay proceedings and hold the case in abeyance while he returned to state court to exhaust his state remedies with respect to those claims.  (ECF No. 147.)  When no objections to the Report and Recommendations were filed, the District Judge issued an Order on October 20, 2016 adopting the Report and Recommendation.  (ECF No. 148.)

After Petitioner then proceeded to raise the two unexhausted ineffective assistance claims in a habeas petition to the California Supreme Court and the Supreme Court denied the petition on procedural grounds, Petitioner filed a Motion to Lift Stay herein on June 22, 2017.  (ECF No. 149.)  On July 6, 2017, the Court granted Petitioner's Motion and set a briefing schedule.  (ECF No. 150.)

On September 22, 2017, Respondent filed his Answer to the FAP, along with a supporting Memorandum of Points and Authorities.  (ECF Nos. 152, 152-1.)  In the Answer Memorandum, Respondent contended in the first instance that the ineffective assistance claims should be dismissed for being procedurally defaulted.  (ECF No. 152-1 at 9-11.)  Respondent proceeded to address the merits of Petitioner's ineffective assistance claims under a de novo standard of review (which Respondent conceded was the appropriate standard).  (Id. at 11-26.)  On October 16, 2017, Petitioner filed his Traverse.  (ECF No. 154.)

Based on its initial review and consideration of Petitioner's two ineffective assistance claims, the Court issued an Order Setting Status Conference on May 31, 2018.  (ECF No. 156.)  The Court advised therein of its conclusions that (a) the procedural default defense raised by Respondent was not an obstacle to the Court's consideration of those claims on the merits, and (b) in order to decide Petitioner's ineffective assistance claims

on the merits, it was going to be necessary to conduct an evidentiary hearing.[3]  (Id. at 1-4.)
In light of its conclusions, the Court set the matter for a status conference.  (Id. at 5.)

The Court held several status conferences prior to the evidentiary hearing.  (See ECF Nos. 157, 159, 166, 171.)[4]  At the last status conference, the Court set an evidentiary hearing for February 6, 2019.  (See ECF No. 172.)  Prior to the hearing, on January 18, 2019, the parties filed pleadings reflecting several stipulations to the admissibility of evidence and the testimony of trial counsel, and requesting that the Court vacate the hearing and resolve the matter based on the documentary evidence in the record.  (See ECF Nos. 173, 174.)  On February 4, 2019, the Court vacated the evidentiary hearing and took the matter under submission.  (ECF No. 175.)

Thus, this matter now is ready for decision.  For the reasons discussed hereafter, the Court recommends that habeas relief be **DENIED** with respect to Petitioner's ineffective assistance of trial counsel claim based on counsel's failure to move to have Petitioner declared incompetent to stand trial, and **GRANTED** with respect to Petitioner's ineffective assistance of trial counsel claim based on counsel's failure to investigate and present a mental-health based defense.

**PROCEDURAL HISTORY**

On April 28, 1995, the People of the State of California charged Petitioner by information with one count of murder (Cal. Penal Code § 187(a)).  (ECF No. 10-3 at 4;

---

[3]     To the extent Respondent disputes either or both of the foregoing conclusions, the Court incorporates herein by this reference its May 31, 2018 Order Setting Status Conference [ECF No. 156].

[4]     At the October 16, 2018 status conference, the Court discussed with counsel possible ways to streamline the evidentiary hearing and counsel entered into various stipulations regarding the evidence to be considered/presented.  (See ECF No. 167.)  At the December 14, 2018 status conference, the Court discussed with counsel the possibility of entering into stipulations that would make the evidentiary hearing unnecessary, and the Court ordered counsel to file the same with the Court, if they elected to proceed in such a fashion.  (See ECF No. 172.)  All the evidence discussed herein falls within the scope of the parties' stipulations.

ECF No. 10-21 at 6.)  The information also alleged that Petitioner personally used a firearm during commission of the murder (Cal. Penal Code § 12022.5(a)).  (ECF No. 10-3 at 4-5; ECF No. 10-21 at 6.)  Beginning on July 12, 1995, the matter was tried to a jury.  (ECF No. 10-3 at 5; ECF No. 10-21 at 6.)  On July 24, 1995, the jury found Petitioner guilty of the lesser included offense of second degree murder and made a true finding on the firearm enhancement.  (ECF No. 10-3 at 5; ECF No. 10-21 at 6; ECF No. 10-17.)  On August 21, 1995, Petitioner was sentenced to the upper term of 15 years to life.  (ECF No. 10-21 at 6; ECF No. 10-18.)  Petitioner additionally was sentenced to the upper term of 10 years on the firearm use enhancement, for a total sentence of 25 years to life.  (Id.)

On June 25, 1996, Petitioner filed a direct appeal in the California Court of Appeal, claiming insufficiency of the evidence, instructional error, evidentiary error, and prosecutorial misconduct.  (ECF No. 10-20.)  On May 9, 1997, the Court of Appeal affirmed the judgment of conviction, and on August 20, 1997, the California Supreme Court denied review of Petitioner's case without comment.  (ECF Nos. 10-3, 10-5.)

On November 4, 2003, Petitioner filed a state habeas petition in San Diego Superior Court.  (ECF No. 10-6 at 209.)  The Superior Court denied the petition as untimely on December 4, 2003.  (Id. at 208-11.)  On August 27, 2004, Petitioner filed a habeas petition in the California Court of Appeal.  (ECF No. 10-6.)  The Court of Appeal denied the petition on the merits on September 15, 2004.  (ECF No. 10-7.)  On August 23, 2005, Petitioner filed a habeas petition in the California Supreme Court.  (ECF No. 10-8.)  The petition was denied on June 14, 2006.  (Id.)  On March 16, 2009, Petitioner filed a second habeas petition in San Diego Superior Court.  (ECF No. 70-7 at 1-13.)  The petition was denied as untimely on May 15, 2009.  (Id. at 14-16.)

On August 28, 2009, Petitioner initiated federal proceedings by filing a pro se Petition for Writ of Habeas Corpus in this Court.  (ECF No. 1.)

/ / /

/ / /

/ / /

# SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Since Petitioner is not contesting the sufficiency of the evidence to support his conviction, the following summary is taken from the "Facts" section of the California Court of Appeal opinion:

> Jones lived with his wife and children in an apartment in a neighborhood where people commonly sought to show their toughness by making threats. Jones knew [Michael Anthony] High ["High"] from the neighborhood. Jones did not act as if he were afraid of High.
>
> On one occasion, while Jones was working on a truck, High played with a revolver and said to Jones, "You would never know if I come up and shoot [sic] you, would you?" On another occasion, while Jones was emptying trash, High said to Jones, "I could have stuck you, could have just . . . stabbed you." High did not act on those threats.
>
> On a later occasion about 8 p.m. on January 11, 1995, High and Mark Robinson arrived at Jones's apartment and knocked loudly on the front door. Jones went to an upstairs window and asked who was there. Robinson said, "It's me, blood."[5] Jones went downstairs and opened the door. Robinson told Jones, "Get my money." Jones told Robinson he would be the first to know when Jones got Robinson's money. Robinson walked away.
>
> Asking Jones about a rumor that Robinson made sexual advances toward the girlfriend of another man, High said, "What is up with that he-say-she-say shit?" High opened the screen door and began pulling on Jones. Jones extricated himself and pushed High outside. Jones's wife said, "Shoot him." As High tried to enter the apartment, Jones again pushed him outside. Remaining outside, High yelled at Jones to come outside and shouted obscenities about Jones's wife.
>
> Angered, Jones went outside where he and High swung at each other but missed. Jones then pulled a gun from his pocket and shot into the air. High ducked and rolled to the ground. As High rolled on the ground, Jones chased High and shot him.
>
> Trying to run away, High hopped over two fences. Jones chased High and fired another shot. High's back arched, his arms went back, and his chest thrust forward as he fell face first into the street having been shot in the back.

---

[5] In the neighborhood the term "blood" meant friend.

When High rolled over onto his back in the street, Jones approached and stood over him. Standing less than a foot from High, Jones shot him three times in the face.[6] Although High was still breathing, Jones walked away from him without offering medical assistance or seeking to summon an ambulance. Jones then rode away on a bicycle.

Paramedics arriving at the scene did not find any weapons on High's person.

On January 13, 1995, about 7 p.m., High died from the multiple gunshot wounds.

On January 26, 1995, a deputy sheriff searched Jones's apartment and found a gun. A comparison of the bullets fired from Jones's gun and four missile fragments removed from High's body was inconclusive but indicated High could have been shot with Jones's gun.

(ECF No. 10-3 at 2-4.)

### PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

1.     Trial counsel provided ineffective assistance by not investigating and presenting a mental-health based defense. (ECF No. 141 at 26-34; ECF No. 154 at 7-20.)

2.     Trial counsel provided ineffective assistance by not moving to have Petitioner declared incompetent to stand trial. (ECF No. 141 at 43-46; ECF No. 154 at 21-24.)

### STANDARD OF REVIEW

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to,

---

[6]     The Court notes that although the Court of Appeal opinion states that petitioner shot High three times in the face, the evidence presented at trial and the arguments contained in the FAP and Answer Memorandum indicate that petitioner only shot High twice in the face. (See ECF No. 141 at 6, 8, 14; ECF No. 152-1 at 16; ECF No. 10-11 at 174-75; ECF No. 10-12 at 107.)

7

or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Here, Respondent concedes that, because there was no state court adjudication on the merits of the two ineffective assistance of trial counsel claims alleged by Petitioner in the FAP, those claims are not governed by the AEDPA standard of review. (ECF No. 152 at 2; ECF No. 152-1 at 11.) Rather, the governing standard of review for those claims is *de novo*. See Nulph v. Cook, 333 F.3d 1052, 1056-57 (9th Cir. 2003) (holding that "AEDPA's deferential standard" does not apply "[b]ecause the state court did not issue a decision on the merits"); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo."); see also, e.g., Williams v. Ryan, 623 F.3d 1258, 1264 (9th Cir. 2010) (where state court denies claim on inadequate procedural ground, "[t]he deference AEDPA requires for state court determinations . . . does not apply and [federal court] review of [the] claim is de novo").

## DISCUSSION

The Sixth Amendment to the United States Constitution guarantees the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In Strickland, the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice." Id. at 687. "Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. Id. at 688-90. To show "deficient performance," Petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90. Further, Petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690. The Court must then "determine whether, in light of all the circumstances, the

identified acts or omissions were outside the range of professionally competent assistance." Id. The Supreme Court in Strickland recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Accordingly, to overturn the strong presumption of adequate assistance, Petitioner must demonstrate that "the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case." Lord v. Wood, 184 F.3d 1083, 1085 (9th Cir. 1999).

To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, Petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Lockhart v. Fretwell, 506 U.S. 364, 372 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").

It is unnecessary to address both Strickland requirements if the Petitioner makes an insufficient showing on one. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); see also Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the Strickland test obviates the need to consider the other."); Williams v. Calderon, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995).

## I.    Habeas relief is not warranted with respect to Petitioner's ineffective assistance claim based on trial counsel's failure to move to have Petitioner declared incompetent to stand trial.

In Claim Two of the FAP, Petitioner alleges that he received ineffective assistance in violation of the Sixth Amendment when his trial counsel, Thomas Kelley ("Mr. Kelley"), failed to move to have him declared incompetent to stand trial. (ECF No. 141 at 43-46.)

/ / /

A. Governing law

The Due Process Clause does not allow the State to prosecute defendants while they are incompetent. Drope v. Missouri, 420 U.S. 162, 172 (1975). A defendant is competent to stand trial only if he or she has (1) "a rational as well as factual understanding of the proceedings against him," and (2) "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam); see also Clark v. Arnold, 769 F.3d 711, 729 (9th Cir. 2014); Deere v. Cullen, 718 F.3d 1124, 1144 (9th Cir. 2013).

Competence "has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." Godinez v. Moran, 509 U.S. 389, 402 (1993); see also Drope, 420 U.S. at 171 ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."); Dusky, 362 U.S. at 402 ("[I]t is not enough . . . that the defendant is oriented to time and place and has some recollection of events." (internal quotation marks omitted)); Odle v. Woodford, 238 F.3d 1084, 1088-89 (9th Cir. 2001) ("[C]ompetence to stand trial does not consist merely of passively observing the proceedings. Rather, it requires the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense.").

"Counsel's failure to move for a competency hearing violates the defendant's right to effective assistance of counsel when 'there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered.'" Stanley v. Cullen, 633 F.3d 852, 862 (9th Cir. 2011) (quoting Jermyn v. Horn, 266 F.3d 257, 283 (3d Cir. 2001)).

In Deere, 718 F.3d at 1145-46, the Ninth Circuit considered the following factors in determining whether there was a reasonable probability the defendant would have been

3:09-cv-01896-JM (RNB)

found incompetent: (1) the reports of all the mental health experts[7]; (2) the nature of personal interactions between the defendant and the trial judge, to consider whether these showed lucid, appropriate responses to questions and established the defendant's understanding of the proceedings and ability to consult with counsel; (3) the actions of defense counsel, since competence is ultimately a "legal" question "that judges and lawyers deal with all the time"[8]; (4) whether the prosecutor believed the defendant to be competent; (5) whether the facts of the crime suggested "someone out of touch with reality"; and (6) whether the trial transcripts illustrate the defendant "actually understood what was going on."

B. <u>Analysis</u>

Petitioner maintains that "objectively reasonable counsel" should have doubted Petitioner's competency to stand trial, <u>Stanley</u>, 633 F.3d at 862, and that Petitioner did not have a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," <u>Dusky</u>, 362 U.S. at 402. (ECF No. 141 at 44-45.)

In response, Respondent contends that "[t]he fundamental question here 'boils down to this . . . was there a reasonable probability that [Petitioner] would have been found incompetent' if the issue had been raised in advance of trial?'" (ECF No. 152-1 at 16

_____

[7] The reports of all the mental health experts includes both those who examined the defendant at the time of the proceedings and the "Johnny-come-latelies." <u>Deere</u>, 718 F.3d at 1145. In the Ninth Circuit, "[b]elated opinions of mental health experts are of dubious probative value and therefore disfavored." <u>Deere v. Woodford</u>, 339 F.3d 1084, 1086 (9th Cir. 2003); <u>Williams v. Woodford</u>, 384 F.3d 567, 608 (9th Cir. 2004) ("[W]e disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial.") However, such opinions "are permissible when it is possible to make an accurate retrospective evaluation, for example, by consulting cotemporaneous medical reports." <u>See</u> <u>Williams</u>, 384 F.3d at 610.

[8] Counsel generally is in the "best position" to evaluate a defendant's comprehension of the proceedings. <u>Hernandez v. Ylst</u>, 930 F.2d 714, 718 (9th Cir. 1991); <u>see also</u> <u>Williams</u>, 384 F.3d at 608 (viewing counsel's opinion of competence to be "especially relevant").

(citing <u>Deere</u>, 718 F.3d at 1145). Respondent further contends that each of the <u>Deere</u> factors demonstrates that Petitioner was competent at the time of trial. (<u>See</u> <u>id.</u> at 16-21.)

The Court's own consideration of the <u>Deere</u> factors follows.

    1.    Whether the facts of the crime suggested "someone out of touch with reality"

The Court acknowledges that this one <u>Deere</u> factor weighs in favor of a finding of incompetence. From an objective standpoint, neither the mercy killing story Petitioner originally told the police in his pretrial statement, (<u>see</u> ECF No. 10-2 at 19-22, 46-49, 52, 70-71), nor the self-defense story Petitioner told at trial, (<u>see</u> ECF No. 10-12 at 95-98, ECF No. 10-13 at 4), made sense. Rather, both stories suggested "someone out of touch with reality," which goes to the issue raised by Claim Two of whether trial counsel should have investigated and presented a mental-health based defense.

    2.    Whether the trial transcripts illustrate the defendant "actually understood what was going on"

Petitioner testified on his own behalf at trial on July 18, 1995. (<u>See</u> ECF Nos. 10-12 at 63 to 10-13 at 100.)

Petitioner testified coherently and spoke in complete, responsive sentences. He was a reliable historian, spatially aware (<u>e.g.</u>, he could easily identify and explain photographs and locations), and did not appear to have any memory issues.

Petitioner also described himself as a competent and productive individual prior to shooting High on January 11, 2015. For example, Petitioner testified on direct examination as follows regarding his duties as the manager of his apartment complex, and his assumed responsibilities after he resigned from that position:

Q:    You also indicated that you had some responsibility to the apartment complex itself?

A:    Yes, sir, I did.

Q:    And if you could describe for the jury what that was?

/ / /

A: Well, when I was the apartment manager, my responsibility was to keep the place cleaned, pick up the trash, keep the grass cut, do the landscaping maintenance, to do the plumbing, if they had any plumbing problems, whatever, do pipe fitting. I was just a general handyman at that time.

Q: Okay. And you indicated that you were the manager. Was there a time when you weren't the manager any longer?

A: Yes, sir, up until like, I think, October of last year.

Q: October of '94?

A: Yes, sir.

Q: And did somebody else become the manager?

A: No, sir. There was nobody else the manager.

Q: And what – who then performed your responsibility?

A: Well, no one assumed the responsibility. I kept the responsibility up. I felt I lived there in that area, in that particular complex. So anybody with my type of quality would like to live in a clean place, at least the area. And I took it on myself to keep the trash and keep the grass cut and whatnot. The fences were torn down. I go ahead and just go get boards and whatever and try to do my best to keep the place up to par.

(ECF No. 10-12 at 69-70.)[9]

Petitioner had a detailed recollection of the night of the shooting. For example, on direct examination he described the beginning of the evening as follows:

Q: We were going back, and now specifically talking about the evening of January 11th, 1995. You remember that date?

A: Yes, sir.

_____

[9] The Court notes that documents from Child Protective Services state that on January 26, 1995, the date of petitioner's arrest, his home "was in a state of severe disrepair/filthiness and unsanitariness including, but not limited to, filthy, dirty and extremely cluttered with dirty clothes, boxes, debris, and garbage strewn throughout, roaches crawling throughout the home, boxes stacked next to wall heater creating a fire hazard and drug paraphernalia within reach of children." (FAP Exh. D at D176.) Petitioner later testified that he was in the process of moving and that is why his house was "dirty like it was" on the day of his arrest. (ECF No. 10-13 at 85.)

| | |
|---|---|
| Q: | At some point in that evening did Thumper come to your door? |
| A: | Yes, sir. |
| Q: | Now, what time of day or night was that, if you know? |
| A: | The first time he came to my door, I was not present. The second time he came to my door, I was home. |
| Q: | The second time, when was that? |
| A: | That was the night, January the 11th. |
| Q: | But what time? Was it dark out? |
| A: | Yes, it was dark out. |
| Q: | And could you describe the weather conditions? |
| A: | It was – it was dark, had been raining, like a little mist or a drizzle. |
| Q: | And the time you were at home, that he came to the door, were you home alone? |
| A: | No, sir. |
| Q: | The door that he came to, is that the front door of the apartment? |
| A: | Yes, sir. |
| Q: | Okay. How did you know that he was at your front door? |
| A: | Well, I didn't know at first that it was him at the door until I looked out of the upstairs bedroom window. And there's a porch, I guess, that goes out, that exceeds beyond the porch a little bit. So if it rains I wouldn't get wet. Until he like ducked. He like took a couple of steps backwards, then I could see him downstairs. |

(ECF No. 10-12 at 76-77.)

Later, in discussing his decision to go downstairs and open the front door to High and another individual, Petitioner testified on direct examination as follows:

| | |
|---|---|
| A: | [High] said he was going to come in my house and get me if I didn't come out. |
| Q: | Okay. What happened next, if anything? |
| A: | I said, "Okay. Just a minute." I pointed my finger, said, "Just a minute. I'll be right down. Just a minute." I closed the window. |
| Q: | Okay. |
| A: | The wife – |

3:09-cv-01896-JM (RNB)

Q:   What did you do next?

A:   I walked across – around the king size bed that we have in our bedroom, and my wife says, "Don't go down there," and I looked at her and I said, "Well, honey, this guy's talking about coming in here, in my house and pulling me up out of here or coming in here, do some damage to me. I'm not going to have that happen."

Q:   So did you go downstairs?

A:   Not right then, because we had like – it was – we had like a couple of seconds, maybe 30 seconds or maybe more. We had a little conversation as to why I shouldn't go downstairs. I just told her, "I'm the man of this house. I pay the bills here. I'm not going to have anybody come in and disrespect me in my own house."

Q:   Then what happened?

A:   Then she didn't say anything else. I told her "Just be quiet, and let me handle this. I'm the man of the house. I will handle this problem."

     So I proceeded to go downstairs. I think we got like 17 steps, maybe, or 18 steps, but I went down four of those steps. I took four steps down the stairs and my front door was open, and it – just fear came over me. I didn't know what to do because my daughter was downstairs in the kitchen, and the front door was open. So I tipped-toed back upstairs.

Q:   So you noticed your front door was open?

A:   Yes sir.

Q:   And this was while you were halfway downstairs?

A:   I wasn't halfway. I was just not even a quarter of the way down.

Q:   And when you noticed the front door open, what did you do?

A:   I quietly stepped back upstairs and stepped into my bedroom and reached up on top of my dresser, but it had a mirror, and then it had a shelf on top of that. I reached up there and I grabbed a .22 revolver. I put it in my pocket and I ran downstairs immediately.

(ECF No. 10-12 at 83-84.)

Throughout his testimony, Petitioner demonstrated that he understood what was happening at the trial and was following the testimony of the other witnesses. For example, the district attorney asked Petitioner if he remembered Sharon Mack talking. Petitioner responded: "Yes, sir I remember that." The district attorney then stated: "And Sharon I

believe from my recollection said something about Mark asked you for money and you said 'Hey, when I get my money you will get your money'"? Petitioner responded, "That is what she said." (ECF No. 10-13 at 17.) In addition, Petitioner was able to understand and follow the questions being asked. Petitioner typically only asked Mr. Kelley or the district attorney to repeat a question after an objection had been made or there was a sidebar with the trial judge.

Petitioner also demonstrated an understanding of nuance during the trial. On cross-examination, Petitioner and the district attorney had the following interaction regarding the gun that was used to shoot High:

> Q:     So another reason – what you are basically saying to [Detective] Camacho is the person who owned the gun wanted it back and that is why you got the gun back?
>
> A:     No, Sir, that is what I told my sister-in-law because she said she disposed of the gun.
>
> Q:     That is what you told Camacho?
>
> A:     I told her the person I got the gun from wanted the gun back. That is what I told Camacho that I told my sister-in-law, yes.
>
> Q:     And the person you got the gun back was named Keith, or the person that owned the gun was Keith?
>
> A:     I don't know if that was the owner of the gun but that is the person I got the gun from.

(ECF No. 10-13 at 80.)

At one point, on cross-examination of Petitioner, the district attorney played audio recordings for the jury of Petitioner's interview with the police that took place on January 26, 1995. (See ECF No. 10-13 at 55-59.) Mr. Kelley asked Petitioner his emotional state at the time of the interview. (See id. at 97.) Petitioner testified that "[w]hen those tapes were made, at the time of the interrogation, I was very emotionally upset, distraught. Again, I was scared. I had a lot of fear, adrenalin, fear running through my body. I was trembling." (See id.) Petitioner also testified that he was crying at the time. (See id.)

///

The transcript of Petitioner's police interview also illustrates that Petitioner "actually understood what was going on." At the patrol station following his arrest,[10] Petitioner was advised of his <u>Miranda</u> rights and initially declined to speak with the officers. (<u>See</u> ECF No. 10-2 at 8-9.)

Petitioner did, however, begin to make voluntary statements regarding the incident. (ECF No. 10-1 at 250.) Sometime later, while Petitioner was in a holding cell, he requested to speak with a patrol deputy sheriff he recognized. (<u>Id.</u>; <u>see also</u> ECF No. 10-2 at 10.) After speaking with this officer, he decided to make a statement regarding the shooting. (ECF No. 10-1 at 250.) After being re-advised of his rights, Petitioner talked with the officers. (<u>Id.</u>; <u>see also</u> ECF No. 10-2 at 11-13.)

Petitioner told police what happened on the night of January 11, 1995. (ECF No. 10-2 at 13-22.) He spoke in complete, coherent sentences and provided a long narrative describing the evening's events. (<u>See id.</u>) After he was done, Petitioner told the police "it's not premeditated or anything like that." (<u>Id.</u> at 113.) When asked if there was anything Petitioner wanted the district attorney to hear from him, Petitioner stated:

> I just want the District Attorney to try and understand and put himself in my shoes, you know, in a situation like this. It is the unexpected, you know? I wasn't expecting it. I've always felt dangered, you know? I've always felt danger and I've always felt like somebody's out to do somebody harm to me or something. You know? It's a true feeling. I'm not the type of person to hurt anybody. You know, I never have. But it was a situation that was brought to me. I tried to control it but there was no way out of it. But in all actuality

---

[10] Following the incident, police received anonymous and confidential information that Petitioner was the perpetrator of the shooting. (ECF No. 10-1 at 250.) Police then learned that petitioner was on probation at the time and had a Fourth Amendment waiver allowing the search of his person and residence. (<u>Id.</u>) They also learned that petitioner was possibly selling narcotics. (<u>Id.</u>) Based on this information, police performed a Fourth Amendment waiver search on petitioner's residence on January 26, 1995. (<u>Id.</u>) The police located a .22 caliber R.G. revolver and ammunition inside the residence, as well as nunchaku. (<u>Id.</u>) Petitioner was arrested for possessing the nunchaku and taken to a patrol station, where the police decided to question him about the High murder. (<u>Id.</u>)

> I believe if it hadn't, if I hadn't of did what I did it would have been me laying out there, or right there.

(Id. at 115.)

The Court also finds relevant to this factor the evidence of Petitioner's interview with the probation officer on August 8, 1995, after the trial. Petitioner told his probation officer that his "physical health" was "good" and his "psychological/medical problems" only included being required to attend Narcotics Anonymous meetings and the loss of the tops of three of his fingers due to a saw mill accident. (See ECF No. 10-1 at 256-57.) Petitioner was able to discuss in detail the factors of the offense and relay his personal history to the officer. (See id. at 253-58.)

>        3.        The nature of the personal interactions between the defendant and the trial judge

The Court's review of the trial transcripts does not reveal any instances in which Petitioner disrupted the trial or acted in a peculiar manner.[11]

The record does not include significant discussions directly between Petitioner and the presiding trial judge. At Petitioner's sentencing on August 21, 1995, Petitioner made the following statement to the judge, which demonstrated an understanding of what he had done, the proceedings, and what he was facing if convicted:

/ / /

/ / /

/ / /

/ / /

---

[11]    Cf. Maxwell v. Roe, 606 F.3d 561, 569 (9th Cir. 2010) (finding the petitioner's "uncontrolled and disruptive behavior in the courtroom and signs of irrationality and paranoia when it came to his own defense should have raised a doubt about his competency") (citing Drope, 420 U.S. at 180; Torres v. Prunty, 223 F.3d 1103, 1109 (9th Cir. 2000) ("defendant's unusual and self-defeating behavior in the courtroom" was a factor that "suggested that an inquiry into competence was required")).

I would just like to add to all this here me being a human being, admit that I did cross that fine line and made a mistake. I do regret it. As a human being, I am very remorseful that it did happen. I wish it never had of happened. But since it did happen, I must suffer and pay the consequences for this crime that I committed. Although keeping in mind that I am a human being, I do have loved ones out there that love me as well. So if you have any mercy upon me or if not, then I will accept it as it is.

(ECF No. 10-18 at 5.)

Moreover, after having had the opportunity to observe Petitioner's functioning throughout the trial and during his lengthy trial testimony, as well as during the sentencing hearing, the trial judge remarked during the sentencing hearing that he saw Petitioner as "articulate [and] intelligent." (ECF No. 10-18 at 6.) The only inference to be drawn from the foregoing remark is that the trial judge harbored no doubt about Petitioner's competence at the time of trial.

4.   The actions of defense counsel

Petitioner's first attorney was Danny Lester, a public defender. Mr. Lester represented Petitioner from the time of his arraignment on January 31, 1995 to March 9, 1995, when he was relieved due to a conflict of interest. (See FAP Exh. D at D1.) It appears from Mr. Lester's "Case Activity Log" that Mr. Lester met in person or spoke on the phone with Petitioner for approximately four and a half hours, and also spoke with Petitioner's stepbrother and wife. (Id.) There are no notations in the Case Activity Log indicating Mr. Lester ever had a doubt about Petitioner's competence. (See id.) At no time during his representation did Mr. Lester request a competency examination or raise the issue of Petitioner's competence before the court.[12]

---

[12]   Although "counsel is not a trained mental health professional, and his failure to raise petitioner's competence does not establish that petitioner was competent," Odle, 238 F.3d at 1088-89), "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," Medina v. California, 505 U.S. 437, 450 (1992). See Maxwell, 606 F.3d at 574; see also Fierro v. Ducart, 734 F. App'x 391, 393 (9th Cir. 2017) (finding the district court did not err in denying the petitioner's claim that he was

After Mr. Lester was relieved of his appointment, Mr. Kelley was appointed. At present, Mr. Kelley has "little memory of Christopher Jones or his trial," and he did not maintain his case file. (ECF No. 173 at 2.) Of his career generally, Mr. Kelley states that he "would not have allowed a client he believed to be incompetent to stand trial or take the stand to testify." (Id. at 3.) Though Mr. Kelley at times represented clients who suffered from schizophrenia, he "never got any of that from Mr. Jones." (Id. at 3.) His "Attorney Time Sheet" indicates that he met with Petitioner for approximately eight hours between March 14, 1995 and May 3, 1995 outside of court. (See FAP Exh. D at D2-D3.) There are no notations in the Attorney Time Sheet indicating Mr. Kelley ever had a doubt about Petitioner's competence. (See id.) At no time during his representation did Mr. Kelley request a competency examination or raise the issue of Petitioner's competence before the court.

The Court also finds relevant to this factor Petitioner's criminal history record. Prior to the shooting on January 11, 1995, Petitioner was involved with the criminal justice system. In February 1992, Petitioner was convicted of battery, sentenced to custody, and ordered to attend stress management classes. (ECF No. 10-1 at 255.) In October 1992, Petitioner was convicted of vandalism and sentenced to custody. (Id.) The next month, Petitioner was convicted of being under the influence of a controlled substance and sentenced to custody. (Id.) Shortly thereafter, in March 1993, Petitioner was convicted of possessing a controlled substance and sentenced to custody. (Id.) The Court infers from these prior convictions that none of Petitioner's previous counsel believed he was incompetent to stand trial.

///

incompetent to stand trial, in part, because "[t]here is no evidence in the record that any of [the petitioner]'s three defense attorneys or the state trial judge who observed and interacted with [the petitioner] questioned his competency to stand trial") (citing Deere, 718 F.3d at 1145–46; Williams, 384 F.3d at 608).

3:09-cv-01896-JM (RNB)

### 5. Whether the prosecutor believed the defendant to be competent

The record before the Court does not include any direct evidence of the prosecutor's belief. However, there is no indication in the trial transcript that the prosecutor ever had any doubt about whether Petitioner was competent.

The Court also finds relevant to this factor petitioner's criminal history record discussed above, from which the Court infers that none of the previous prosecutors who charged Petitioner with crimes believed he was incompetent to stand trial.

### 6. The reports of all the mental health experts

#### a. contemporaneous evidence

The record before the Court does not include any contemporaneous reports of mental health experts, but it does include Petitioner's contemporaneous medical records, which do contain evidence relevant to Petitioner's mental health status at the time. These records indicate that when Petitioner was originally arrested, he did not request any medical or psychiatric assistance and denied that he regularly used drugs and that he was suicidal. (FAP Exh. B at B1.) On January 29 and 31, 1995, Petitioner complained of "back pain." (Id. at B2.) On February 6, 1995, Petitioner complained of a metal particle embedded in his thumb that he got from the shower. (Id. at B3.) On February 11 and 12, 1995, Petitioner requested dental services because of tooth pain. (Id. at B5, B6.)

It was not until a month after he was arrested that Petitioner first requested to see a psychiatrist. (See id. at B3.) He informed staff that he was feeling suicidal,[13] having audio

---

[13]    The Court is mindful that a suicide attempt, in context, may give rise to concern about a defendant's competency, see Drope, 420 U.S. at 180-81; Moran v. Godinez, 57 F.3d 690, 695 (9th Cir. 1994); however, "[not] every suicide attempt inevitably creates a doubt concerning the defendant's competency." United States v. Loyola-Dominguez, 125 F.3d 1315, 1318-19 (9th Cir. 1997). In this case, Petitioner never attempted suicide, and given the overall context, as described herein, the Court is not persuaded that petitioner's single note that he was feeling suicidal raises a reasonable probability that petitioner would have been found incompetent to stand trial had the issue been raised and fully considered.

and visual hallucinations, and could not sleep.  (See id. at B3, B27.)  Petitioner was then sent that same day to the "safety cell" at George Bailey Detention Facility for "further observations [and] psych evaluations."  (Id. at B3)

On February 28, 1995, Petitioner was evaluated by a psychiatrist, who noted the following:

> [Patient] was transferred from SB jail after a note was received by medical staff indicating [patient] had AH, VH, HI, SI and insomnia.  The note was written in a clear and logical manner.  He also wrote, "I need some help before I lose a grip on reality."
>
> . . .
>
> This 31 y.o. black male sat in the safety cell at GBDF.  He was superficially cooperative with the interview, though he squinted and avoided eye contact throughout the interview.  He c/o needing sleep, feeling hungry, hearing voices of his name being called and voices telling him to hurt others,  He explained that his "friends" Cleo and Leo tell him not to hurt other, that[] they'll take care of it.  [Patient] had an incongruent affect with occasional laughter inappropriate to content. [No] tearfulnesss.  [Patient] claimed he did not know when he was arrested, the year, or what were his charges.  When pressed to remember he eventually offered, "they said I tried to hurt someone."  In fact, [patient] is here on murder charges, with two upcoming court dates of 3/3 and 3/6/95.  [Patient] was a very poor historian, with poor short term and long term memory.  He did say that he had never been treated for a psychiatric disorder, never been hospitalized, and that there was no known psychiatric illness in his family.  [Patient] did not elaborate on any questions asked.  He repeated several times that he had been unable to sleep.  Speech was soft and indistinct at times, requiring me to ask him to repeat himself.  At times he spoke nonsensically.  Drugs, EToh: Admitted to Crystalk [sic] use of indeterminate amt.  Denied ETOH.  Assessment: R/O Psychotic Disorder NOS vs. Malingering.  Crystal meth abuse.  Plan: CTO in safety cell due to [patient's] current "visions" of two men, command AH, and SI.  Psychiatric interview to further assess for diagnosis, need for medications.

(Id. at B27.)  Petitioner was prescribed Mellaril that same day.  (Id. at B7, B16.)

On March 1, 1995, Petitioner requested dental services because of a broken tooth.  (Id. at B8.)

///

On March 15, 1995, Petitioner requested mental health services because his "head hurt[]" and he felt "someone [wa]s out to get [him] or [he] might hurt someones [sic]." (Id. at B9.) However, Petitioner's medical records also reflect that on March 15, 1995, Petitioner had been identified the previous afternoon "as being involved in an extortion ring in House 2." (Id. at B12.)

Thereafter, on March 21, 1995, Petitioner's medical records state that Petitioner was "clearly malingering." (Id. at B13.) The records further state that "there is no sight of psychosis" and "no psychotic history." (Id.) The records add that Petitioner has "good control and he follows directions without problems." (Id.) The note-taker also opined that Petitioner, who was facing murder charges, was "trying to fake mental illness." (Id.) He added that it had "been reported [Petitioner] was seen extorting from other inmates" and that Petitioner "does not need to be in psych housing." (Id.) Petitioner was ultimately diagnosed with "malingering" and "amphetamine abuse," discharged, and taken off Mellaril. (Id. at B16, B26.)[14]

On March 23, 1995, Petitioner requested medical attention because he was "starting to have severe headaches" which were "possibly" due to his medication. (Id. at B10.) The source of the headaches is unclear, however, because Petitioner's medical records indicate that Petitioner had been taken off Mellaril a couple of days earlier. (See id. at B10, B16.)

///

_____

[14] See Williams v. Nooth, 671 F. App'x 499, 499-500 (9th Cir. 2016) (finding that the district court did not clearly err in concluding that the petitioner was competent when he entered a guilty plea because "[w]hile the psychiatric reports in the record indicate that [the petitioner] likely suffered from significant mental health issues, they also reflect the possibility that [the petitioner] was malingering and being purposefully noncooperative."); see also Fierro, 734 F. App'x at 392-93 (finding the district court did not err in denying the petitioner's claim that he was incompetent to stand trial, in part, because "[a]ll *contemporaneous* medical evaluations opined that [the petitioner] was able to understand the nature and purpose of the proceedings against him and could cooperate in a rational manner with counsel in presenting a defense.") (emphasis added) (citing Dusky, 362 U.S. at 402; Deere, 718 F.3d at 1145).

After March 23, 1995 and up through the time of sentencing, Petitioner did not again complain about hallucinations, suicidal thoughts, headaches, or express paranoia.

Petitioner did not, however, stop seeking medical services. On April 30, 1995, Petitioner requested medical services because he was "having chest pains." (Id. at B14.) On or around June 8, 1995, Petitioner complained of ankle and foot pain. (See id. at B4, B15, B21.) Petitioner had injured his ankle playing basketball earlier that day and was prescribed Motrin. (Id. at B19, B20.) On July 7, 1995, shortly before his trial, Petitioner requested medical services because his chest and throat were sore. (Id. at B18.)

### b. retrospective expert opinion

In support of Claim Two, Petitioner relies primarily on the January 4, 2016 report of Dr. George W. Woods, Jr., a licensed physician specializing in neuropsychiatry, which was attached to the FAP. (FAP Exh. C at C73-C74). Dr. Woods opined that Petitioner was "unable to reasonably assist his attorney in his defense at the time of his tr[ia]l." (Id. at C74.) It appears from Dr. Woods' report that he reached this conclusion based on Petitioner's alleged mental health issues, his methamphetamine use, his alleged cognitive dysfunction, and his lack of medication during the time of trial. (See id. at C73-C74.)

In coming to the conclusion that Petitioner was incompetent at the time of trial, Dr. Woods specifically relied on his analysis that "[m]ethamphetamine may create an ongoing paranoid psychosis that often continues long after the person stops using the drug[,]" and the fact that Petitioner's ex-wife and mother suggested that Petitioner was suffering from paranoid psychosis in the period of time leading up to the offense. (See id. at C73-C74.) Dr. Woods maintains that Petitioner's paranoid symptoms were not adequately addressed until after he had been in prison and was prescribed Mellaril. (Id. at C74.) When he was taken off Mellaril, Dr. Woods relies on Petitioner's contentions that he became "increasingly paranoid" and "with[drew] from his trial." (Id.) Dr. Woods also specifically relied on his interpretation of Petitioner's trial testimony. Dr. Woods stated that Petitioner's "cognitive defects clearly limited his ability to reasonably appreciate the legal process," and quoted a small section of Petitioner's trial testimony to indicate Petitioner's

"inability to sequence his thinking and to understand the context was undermined to an even greater degree by his methamphetamine use." (Id.)  Dr. Woods contends that Petitioner's trial testimony "reinforces [his] professional opinion that [Petitioner] was unable to reasonably assist his attorney in his defense at the time of his tr[ia]l." (Id.)

The Court does not find Dr. Woods' expert opinion on the issue of Petitioner's competence to be persuasive.  First, Dr. Woods cherry-picks a small segment from Petitioner's trial testimony, which as set forth above, overall demonstrates that Petitioner clearly understood the nature and object of the proceedings against him.  Petitioner testified coherently and spoke in complete, responsive sentences.  He was also a reliable historian, spatially aware (e.g., he could easily identify and explain photographs and locations), and did not appear to have any memory issues.  In addition, Petitioner had a detailed recollection of the night of the shooting, and he set forth his specific version of the events.  Moreover, throughout his testimony, Petitioner demonstrated that he understood what was happening at the trial and was able to follow the testimony of the other witnesses.  Petitioner also was able to understand and follow the questions being asked, and demonstrated an understanding of nuance.

## 7.  Conclusion

Although the facts of the crime did suggest "someone out of touch with reality," in the Court's view it does not follow from this one Deere factor that Petitioner lacked the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense.  None of the other Deere factors weighs in favor of a finding of incompetence.  Therefore, based on its own consideration of the Deere factors, the Court finds and concludes that Petitioner has failed to meet his burden of showing a reasonable probability that he would have been found incompetent to stand trial if his counsel had moved for such a declaration.

Under the authorities cited above, the Court's finding and conclusion that Petitioner has failed to make the requisite showing of Strickland prejudice renders it unnecessary to address the deficient performance prong with respect to this claim.

25

**II.   Habeas relief is warranted with respect to Petitioner's ineffective assistance claim based on trial counsel's failure to investigate and present a mental-health based defense.**

In Claim One of the First Amended Petition, Petitioner alleges that he received ineffective assistance of counsel in violation of the Sixth Amendment when Mr. Kelley failed to investigate and present a mental-health based defense.  (ECF No. 141 at 26-34.)

    A.   Governing law

As noted above, to establish that defense counsel performed deficiently, Petitioner "must show that counsel's representation fell below an objective standard of reasonableness" in light of "prevailing professional norms."  Strickland, 466 U.S. at 688. Here, Petitioner contends that Mr. Kelley's failure to investigate and present a mental-health based defense fell below an objective standard of reasonableness.  As stated in Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  Id. at 691.  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  Id.

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."  Id.

> For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Id.

In other words, the duty to investigate is flexible, and not "limitless."  Bemore v. Chappell, 788 F.3d 1151, 1163 (9th Cir. 2015) (quoting Hendricks v. Calderon, 70 F.3d 1032, 1039 (9th Cir. 1995); United States v. Tucker, 716 F.2d 576, 584 (9th Cir. 1983)). "[A] tactical decision may constitute constitutionally adequate representation even if, in

hindsight, a different defense might have fared better." Id. (citing Hendricks, 70 F.3d at 1039; Reynoso v. Giurbino, 462 F.3d 1099, 1113 (9th Cir. 2006)).

Determining "[w]hether performance was deficient is a fact-specific inquiry; '[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" Id. (quoting Strickland, 466 U.S. at 688-89). "Prevailing professional norms do, however, provide insight into what it means to provide reasonably competent assistance." Id. (citing Bobby v. Van Hook, 558 U.S. 4, 7 (2009)). "Restatements of professional standards," for example, "can be useful as 'guides' to what reasonableness entails . . . to the extent they describe the professional norms prevailing when the representation took place." Doe v. Ayers, 782 F.3d 425, 434 (9th Cir. 2015) (quoting Bobby, 558 U.S. at 7).

At the time of Petitioner's trial in 1995, the prevailing professional norms, as outlined by the ABA standards, required that "[d]efense counsel . . . conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Brodit v. Cambra, 350 F.3d 985, 1006 (9th Cir. 2003) (citing ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993)); see also Doe v. Ayers, 782 F.3d at 434 (quoting Bobby, 558 U.S. at 7, 11) (citing ABA Standards for Criminal Justice 4-4.1(a) (2d ed. 1980)) (same). "The commentary to the standards made clear that 'information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant . . . .'" Doe, 782 F.3d at 434 (quoting Bobby, 558 U.S. at 7-8).

/ / /
/ / /
/ / /
/ / /
/ / /

B.    <u>Analysis</u>[15]

2    In California, convicting a defendant of murder requires the State to prove that the

3    defendant acted "'with malice aforethought.'"  <u>People v. Beltran</u>, 56 Cal. 4th 935, 941

4    (2013) (citing Cal. Penal Code § 187(a)).  Malice aforethought may be express or implied.

5    <u>People v. Elmore</u>, 59 Cal. 4th 121, 132 (2014) (citing Cal. Penal Code § 188).  Express

6    malice is defined in the California Penal Code as "a deliberate intention unlawfully to take

7    away the life of a fellow creature."  <u>Id.</u>  The California Supreme Court has "explained that

8    this 'inartful language' means the defendant must intend to act unlawfully, or in other

9    words, have a 'wrongful intent.'"  <u>Id.</u> at 132-33 (citation and internal quotations omitted).

10   "Malice is implied when an unlawful killing results from a willful act, the natural and

11   probable consequences of which are dangerous to human life, performed with conscious

12   disregard for that danger."  <u>Id.</u> at 133.

13   "Second degree murder is the unlawful killing of a human being with malice

14   aforethought but without the additional elements, such as willfulness, premeditation, and

15   deliberation, that would support a conviction of first degree murder."  <u>Id.</u> (quoting <u>People</u>

16   <u>v. Knoller</u>, 41 Cal. 4th 139, 151 (2007)).  "Manslaughter, a lesser included offense of

17   murder, is an unlawful killing without malice."  <u>Id.</u> (citing Cal. Penal Code § 192; <u>People</u>

18   <u>v. Thomas</u>, 53 Cal. 4th 771, 813 (2012)).

19   "Self-defense, when based on a <u>reasonable</u> belief that killing is necessary to avert an

20   imminent threat of death or great bodily injury, is a complete justification, and such a

21   killing is not a crime."  <u>Id.</u> at 133-34 (emphasis in original) (citing Cal. Penal Code §

22   197(3)).  "A killing committed when that belief is <u>unreasonable</u> is not justifiable."  <u>Id.</u> at

23   134.  "Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to

24   defend against imminent peril to life or great bodily injury does not harbor malice and

25   commits no greater offense than manslaughter.'"  <u>Id.</u> (quoting <u>People v. Flannel</u>, 25 Cal.

26   _____

27
28   [15]    Because the evidence relevant to the Court's analysis of this claim is so extensive,
the Court has set it forth in an Appendix hereto.

3d 668, 672 (1979)); see also In re Christian S., 7 Cal. 4th 768, 771 (1994) ("Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter."). Imperfect self-defense, also known as unreasonable self-defense, however, is "not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter." Elmore, 59 Cal. 4th at 134 (citing People v. Barton, 12 Cal. 4th 186, 200 (1995)).

"California cases reflect the understanding that unreasonable self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone." Id. at 134. "Unlike diminished capacity, imperfect self-defense is not rooted in any notion of mental capacity or awareness of the need to act lawfully." Id. at 135 (citing In re Christian S., 7 Cal. 4th at 777-78). Thus, "unreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are entirely delusional." Id. at 136-37. As the California Supreme Court explained in Elmore, 59 Cal. 4th at 137:

> A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind.

However, a defendant may present "evidence of mental disease, defect, or disorder to support a claim of unreasonable self-defense based on a mistake of fact." Id. at 146. "A defendant who misjudges the external circumstances may show that mental disturbance contributed to the mistaken perception of a threat, without presenting the jury with the same

question it would confront at a sanity trial." Id.[16] Thus, a defendant "who mistakenly believed that actual circumstances required [his] defensive act may argue [he is] guilty only of voluntary manslaughter, even if [his] reaction was distorted by mental illness." Id.

       1.   <u>Petitioner has met his burden of showing the requisite deficient performance.</u>

Petitioner contends that Mr. Kelley's performance was deficient because "[a]ny 'reasonable investigation[]' into [Petitioner's] defense would have required [Mr.] Kelley to investigate [Petitioner's] state of mind on the night of the offense, including whether he had any mental-health issues that might have affected [Petitioner's] perception of High." (ECF No. 141 at 28-29.) Petitioner further contends that Mr. Kelley had "more than a sufficient basis to be on 'notice' that [Petitioner] had serious mental-health issues." (Id. at 29.) According to Petitioner, Mr. Kelley "never investigated [Petitioner's] mental health and whether his mental health (exacerbated by his drug use) might have contributed to [Petitioner] having a genuine, albeit unreasonable, belief in the need to defend himself from High," (id. at 29-30), and this was not a case in which Mr. Kelley made a reasonable decision that no investigation was necessary (id. at 30).

As Respondent accurately notes, the record is sparse regarding Mr. Kelley's investigation or lack thereof, and the factual circumstances surrounding Mr. Kelley's decision-making with regard to presenting a defense at trial. (See ECF No. 152-1 at 23-24.) The parties' stipulation as to Mr. Kelley's testimony sheds no further light on Kelley's actual decision making in Petitioner's case. (See ECF No. 173.) Respondent contends that Petitioner consequently has failed to meet his burden of showing that counsel's representation was deficient as "the 'absence of evidence' cannot overcome the strong

---

[16]    A defendant who contends he "killed in self-defense because of a purely delusional perception of threat must make that claim at a sanity trial. Unreasonable self-defense and legal insanity are distinct theories, and must be adjudicated separately." Elmore, 59 Cal. 4th at 146.

presumption of competence." (ECF No. 152-1 at 24-25.) Respondent further contends that the existing record demonstrates that Mr. Kelley performed competently, noting, *inter alia*, that Mr. Kelley succeeded in avoiding a first degree murder conviction for Petitioner, as the prosecution urged. (See id. at 25-26.) For the reasons discussed hereafter, the Court disagrees with Respondent's contention that Petitioner has failed to meet his burden of showing the requisite deficient performance.

Under prevailing professional norms, Mr. Kelley was required to "conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Brodit, 350 F.3d at 1006 (citing ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993)). This included exploring information concerning Petitioner's "background, education, employment record, mental and emotional stability, family relationships, and the like." Doe v. Ayers, 782 F.3d at 434 (citing Bobby, 558 U.S. at 7-8). The prosecution's first degree murder theory required proof that Petitioner had "specific intent" to commit the crime. (See ECF No. 10-1 at 90-91, 94-98); see also Elmore, 59 Cal. 4th at 132-34. Accordingly, Petitioner's mental condition at the time of the shooting was an essential factor in deciding whether he actually had the required mental state for the crime. See Weeden v. Johnson, 854 F.3d 1063, 1070 (9th Cir. 2017).

At trial, Mr. Kelley presented solely the complete defense of self-defense. However, both Petitioner's expert (Dr. Woods) and Respondent's expert (Dr. Martell) are in accord that the defense of imperfect self-defense also was potentially available based on Petitioner's mental condition at the time of the shooting. (See FAP Exh. C at C65, C70-74[17], ECF No. 165-1 at 3.)

---

[17] The parties have entered a stipulation that "this Court can consider everything in [the expert opinions filed as Exhibit C to the First Amended Complaint], with the exception of Dr. Woods's ultimate conclusion that [Petitioner] in fact had a genuine, albeit unreasonable, belief in the need to defense himself. That conclusion can be found at Exhibit C65 and C73. This Court, however, can consider Dr. Woods's opinions that led him to that conclusion." (ECF No. 174 at 2-3.) The Court accordingly considers Dr. Woods' underlying opinions regarding the effects Mr. Jones' cognitive defects, psychotic

Petitioner maintains that he informed Mr. Kelley during their meetings that he had been hearing and seeing things on the day he shot High, and that he was on psych meds because he was still hearing voices and seeing things. (See FAP Exh. A at A47.) Even if Petitioner's self-serving testimony were deemed not creditworthy, Mr. Kelley should have been aware from Petitioner's medical records while in pretrial detention that Petitioner had mental health issues. (See FAP Exh. B, discussed in detail, supra.) Those records clearly indicate that Petitioner expressed suicidal ideation while in detention, which caused him to be taken to a "safety cell" prior to Mr. Kelley being employed, and to be prescribed Mellaril, "the most toxic of the early antipsychotics." See Wiggins, 539 U.S. at 516 (finding that counsel's investigation into a defendant's background was deficient where counsel failed to uncover details about the defendant's social history that were easily obtainable in "state social services, medical, and school records"); Evans v. Lewis, 855 F.2d 631, 636 (9th Cir. 1988) (holding that counsel was ineffective where he "conducted no investigation to ascertain the extent of any possible mental impairment" even though documents available to counsel prior to the sentencing hearing clearly indicated that the defendant had a history of mental problems, had been incarcerated at a California mental facility for inmates, and had even attempted suicide while in prison).

Further, Petitioner's family members have attested that they were aware of Petitioner's history of mental illness and ongoing drug abuse. (See FAP Exh. A at A#.) The time records of Petitioner's first attorney, Public Defender Lester, indicate that he spoke with Myron Sandifer, Petitioner's half-brother, and Joyce Ann Richmond, Petitioner's wife. (See FAP Exh. D at D1.) Mr. Kelley's time records indicate that he met with Mr. Lester to discuss the case after he was appointed. (See id. at D2.) Moreover, Mr. Kelley's time records list Petitioner's mother's name and phone number. (Id.) Thus, the record evidences that Mr. Kelley had access to Petitioner's family members. However,

symptoms, and his chronic methamphetamine use, and how they may have affected Petitioner's perception and interpretation at the time of the shooting.

Petitioner's wife, aunt, and mother all state that Mr. Kelley never asked them about Petitioner's mental condition around the time of the shooting, (FAP Exh. A at A20, A30, A41), and Mr. Kelley's time records do not indicate that he personally spoke to them at all. (See FAP Exh. D at D2-D3.) That Mr. Kelley would not have spoke about Petitioner's mental health with Petitioner's family members is consistent with the parties' stipulation regarding Mr. Kelley's testimony, which indicates that "[t]ypically, he did not care what the defendant or family member said because he knew what his job was in defending a case." (ECF No. 173 at 3.)

It seems to the Court that the facts of the crime also should have put Mr. Kelley on notice that Petitioner's mental condition at the time of the shooting needed to be investigated. As the prosecutor stated during closing arguments:

> Ladies and gentlemen, [Petitioner] shot [High] in the back. He walked up to him and shot him in the head twice. Once just below the eye, the other on the side of the head. That doesn't look like a murder?
>
> . . .
>
> Basically, there is [sic] two versions as to what happened. One that he shot him in self-defense while he was laying in the gutter, or it was a mercy killing. Neither one of them don't make sense.

(ECF No. 10-15 at 63, 66-67.) The Court agrees. Neither explanation for the shooting proffered by Petitioner and recited by the prosecution made sense, which is why Mr. Kelley should have further investigated the possibility of presenting a mental-health based defense.

Respondent contends that Mr. Kelley did consider and investigate the defense of voluntarily intoxication,[18] which "more closely focused on mental impairment" than

---

[18] The Court notes that, at the time of petitioner's trial, evidence of voluntary intoxication was permissible on the issue of whether a defendant harbored malice aforethought. See People v. Soto, 4 Cal. 5th 968, 976 (2018).

imperfect self-defense; and that, after consulting with Dr. Ornish, Mr. Kelley made a reasonable decision that the defense was not promising, which made further investigation unnecessary. (ECF No. 152-1 at 25.) However, it does not follow from the defense investigator's notation of a one-hour consultation with Dr. Ornish about methamphetamines that Mr. Kelley thereby satisfied his obligation to conduct a reasonable investigation. Mr. Kelley does not remember Dr. Ornish at all, much less what he may have consulted him about, and the parties' stipulation regarding Mr. Kelley's testimony casts no further light on the nature of any defense consultation with Dr. Ornish. (See ECF No. 173 at 3.) There is no evidence before the Court that Mr. Kelley consulted with Dr. Ornish about any other aspect of Petitioner's mental condition at the time of the shooting or that Dr. Ornish ever interviewed Petitioner about his mental health history. Although Respondent contends that the absence of evidence cannot overcome the strong presumption of competent representation, (see ECF No. 152-1 at 25), as the Supreme Court stated in Wiggins, 539 U.S. at 521, the "deference owed [to] strategic judgments" to pursue one trial strategy and not an alternative is "defined . . . in terms of the adequacy of the investigations supporting those judgments." See also, e.g., Weeden, 854 F.3d at 1070 ("Counsel cannot justify a failure to investigate simply by invoking strategy. The Supreme Court has squarely rejected the attempt to justify a limited investigation as reflecting a tactical judgment. Under Strickland, counsel's investigation must determine trial strategy, not the other way around.") (internal quotations and citations omitted)); Bemore, 788 F.3d at 1167 ("Even if presenting mental health evidence would have conflicted with or diluted [the chosen] defense . . . , that fact does not absolve counsel of a duty to investigate a mental health . . . defense. That way, [counsel] could decide in an informed manner which defense was preferable . . . ."); Correll v. Ryan, 539 F.3d 938, 948-49 (9th Cir. 2008) ("[T]he traditional deference owed to the strategic judgments of counsel is not justified where there was not an adequate investigation 'supporting those judgments.'"); Phillips v. Woodford, 267 F.3d 966, 978 (9th Cir. 2001) ("Counsel's failure to consider an alternative defense cannot be considered 'strategic' where counsel has 'failed to conduct even the minimal

investigation that would have enabled him to come to an informed decision about what defense to offer . . . .'") (citing Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994)). Accordingly, the Court finds that, even if Mr. Kelley considered a potential voluntary intoxication defense and made a deliberate tactical decision not to present such a defense, that did not satisfy Mr. Kelley's duty to also investigate a possible mental health-based defense (which both sides' experts have concurred was a potentially viable alternative defense).

Respondent also contends that Mr. Kelley likely suspected that Petitioner's mental health claims were exaggerated due to a mental health assessment at George Bailey Detention Facility which states Petitioner was malingering. (ECF No. 152-1 at 25.) However, the Court concurs with Petitioner that the nurse's suspicion that he was malingering should have provided additional motivation to Mr. Kelley to investigate Petitioner's mental health and verify the nurse's assessment. Mr. Kelley's failure to do so was unreasonable. See Doe v. Ayers, 782 F.3d at 435 (citing Douglas v. Woodford, 316 F.3d 1079, 1088-89 (9th Cir. 2003)) ("[I]f what counsel knows or should know suggests that further investigation might yield more mitigating evidence, counsel must conduct that investigation."); Avila v. Galaza, 297 F.3d 911, 919-21 (9th Cir. 2002) (holding that the lawyer's belief that certain testimony would not be helpful at trial was an unreasonable basis upon which to decide not to investigate and thus constituted deficient performance).

Respondent further contends that a defense based on drug use or mental impairment would have opened the door to evidence about Petitioner's criminal history, including violence and a history of anger problems, which would have undercut Mr. Kelley's strategy to distinguish the behavior of Petitioner and High. (ECF No. 152-1 at 25-26.) However, the Court concurs with Petitioner that Respondent's argument ignores the fact that the door to such "prejudicial evidence" was opened when Mr. Kelley called a witness at trial who testified that High threatened to rob Petitioner of his drug stash the night before Petitioner killed High. (See ECF No. 10-12 at 8-33.)

/ / /

Finally, the Court finds unpersuasive Respondent's contention that Petitioner's statements, particularly the one given to the police after his arrest, would have contradicted a mental-health based defense.  (See ECF No. 152-1 at 26.)  The relevant ABA Standards instructed that defense counsel's duty to investigate exists regardless of the accused's admissions or statements.  See ABA Standards for Criminal Justice, Prosecution Function and Defense Function 4-4.1 (3d ed. 1993); see also Bemore, 788 F.3d at 1168 (The fact "that there was likely to be evidence introduced at trial consistent with premeditation, deliberation, and intent, . . . did not absolve [Mr. Kelley] of the duty to conduct an adequate mental health investigation.").

In conclusion, the Court finds that Mr. Kelley's failure to investigate Petitioner's mental health history and mental condition at the time of the shooting, and then present the mental-health based defense that both sides' experts concur was viable was objectively unreasonable.  It therefore follows that Petitioner has met his burden of showing the requisite deficient performance under Strickland.

2.    Petitioner has met his burden of showing the requisite prejudice.

Counsel's deficient performance justifies relief only if there is a "reasonable probability" that the jury would have reached a different result if adequate representation had been afforded.  Strickland, 466 U.S. at 694.  A reasonable probability is one "sufficient to undermine confidence in the outcome."  Id.  Although counsel's deficient performance must have had more than a "conceivable effect" on the outcome, it need not have "more likely than not altered" the outcome.  Id. at 693.  And, because the jury was required to reach a unanimous verdict on each count, the outcome could have differed if only "one juror would have struck a different balance."  Wiggins, 539 U.S. at 537; see also Weeden, 854 F.3d at 1071.

When an ineffective assistance claim centers on a failure to investigate and present certain evidence, the Petitioner must "demonstrate, with some precision, the content of the testimony they would have given at trial."  Lawrence v. Armontrout, 900 F.2d 127, 130 (8th Cir. 1990) (affirmative proof of prejudice requires a showing that the evidence would

have been presented and would have been favorable) (quoting <u>United States ex rel. Cross v. DeRobertis</u>, 811 F2.d 1008, 1014-15 (7th Cir. 1987)); <u>see also</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 834 (9th Cir. 1995) (in determining whether a defendant was prejudiced by counsel's inadequate representation, courts examine the evidence that could have been presented to the jury had counsel performed competently and compare that to the evidence that the jury actually heard); <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994) (a Petitioner must identify what evidence counsel should have presented which would have shown that the Petitioner was entitled to habeas relief; "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").

Here, the January 4, 2016 report of Dr. Woods evidences the expert testimony the jury would have heard if Mr. Kelley had presented a mental-health based defense at trial. (See FAP Exh. C at C65-C76.)  The jury would have heard that Petitioner was suffering from serious mental health issues at the time of the offense, namely a cognitive disorder, life-long psychotic symptoms, and methamphetamine-related psychosis; that these disorders not only clouded Petitioner's thinking, but some had led him since childhood to hear and see things that were not there; that Petitioner suffered from profound cognitive dysfunction (*i.e.*, that his brain was tragically damaged and had been since his childhood); that Petitioner consequently "perseverates"— he "gets stuck on a word or idea," meaning he struggles to move on from a stimulus once it ceases and also struggles to quickly process changing circumstances; and that Petitioner's judgment and thought process would have been further clouded from the methamphetamine he had been using for the preceding ten days.

If Mr. Kelley had presented a mental-health based defense at trial, the jury also would have heard from the defense expert how this toxic mix of factors conspired against [Petitioner] on the night he shot High, that, as Dr. Woods put it, he "got stuck and was unable to switch his thinking or reconsider his actions."  (<u>Id.</u> at C68.)  Indeed, after reviewing the opinions of Petitioner's experts, Dr. Woods and Dr. Wood, and other case-related evidence, <u>Respondent's expert</u>, Dr. Martell, concluded to a reasonable degree of

psychological certainty that Dr. Woods' "finding that [Petitioner's] behavior during the instant offense reflected frontal lobe dysfunction and 'perseveration' while speculative, is not out of the realm of possibility and as such may have been helpful to the trier-of-fact at trial." (ECF No. 165-1 at 3.) Dr. Martell further concluded that Petitioner "clearly does suffer from Intellectual Disability and cognitive dysfunction, including frontal lobe dysfunction," and has a "legitimate and well documented" history of mental disorder and methamphetamine abuse, and "[g]iven those impairments, it is not unreasonable to conclude that his capacity to reflect on his behavior and assess the threat presented by [High] was impaired." (Id.) Thus, the defense expert testimony summarized above essentially would have been uncontroverted.

Based on the foregoing, the Court finds that the defense expert testimony "would have added an entirely new dimension to the jury's assessment" of the critical issue of Petitioner's mens rea. See Weeden, 854 F.3d at 1070, 1072 (finding expert testimony regarding the effect of the defendant's youth would have added an entirely new dimension to the jury's assessment of the critical issue of the defendant's mens rea, where the defendant's mental condition was an essential factor in deciding whether she "actually had the required mental states for the crime"). The defense expert testimony would have provided critical insight into Petitioner's mental state on the night of the shooting and been responsive to the prosecutor's argument that Petitioner's conflicting explanations for the shooting simply did not make sense.

Respondent contends that presenting this expert evidence would have somehow reduced the contrast between High and Petitioner, which was an important aspect of Mr. Kelley's approach at trial. (See ECF No. 152-1 at 25-26.) The Court rejects this assessment given the nature of the defense expert evidence. Petitioner's expert evidence would have provided an explanation for why Petitioner acted the way he did on the night in question based on factors solely relevant to Petitioner. This is not a situation, for example, where the jury would have been asked to consider the actions of two men high on methamphetamines. Although methamphetamine use is one aspect of Dr. Woods' and

Dr. Wood's opinions, it is an exacerbating factor and not the sole contributing factor to Petitioner's mental state on the night of the shooting.

Considering all the circumstances of this case, the Court finds that there is a reasonable probability that an attorney presenting a mental health defense would have been able to raise a reasonable doubt about whether Petitioner misperceived "objective circumstances" because of a mental illness, cognitive dysfunction, and drug use. See Elmore, 59 Cal. 4th at 133, 136-38. Put another way, the Court finds that, but for Mr. Kelley's deficient performance in failing to investigate and present a mental-health based defense, there is a reasonable probability that at least one juror would have been persuaded that Petitioner only was guilty of voluntary manslaughter based on an imperfect self-defense theory, as opposed to second degree murder. It therefore follows under the authorities cited above that Petitioner also has met his burden of showing the requisite prejudice under Strickland.

## RECOMMENDATION

Based on the above findings and conclusions, IT IS HEREBY RECOMMENDED that the District Judge issue an Order: (1) approving and accepting this Report and Recommendation; and (2) directing that Judgment be entered DENYING habeas relief with respect to Claim Two of the FAP and GRANTING habeas relief with respect to Claim One of the FAP as follows:

> Petitioner shall be discharged of all consequences of his second degree murder conviction in San Diego Superior Court Case No. ECR11253 unless either (a) he is brought to trial and retried on the second degree murder charge within sixty (60) days or such additional time as state law allows, or (b) the judgment of conviction in San Diego Superior Court Case No. ECR11253 is reduced from second degree murder to manslaughter and petitioner is resentenced accordingly (including on the personal use of a firearm enhancement) with credit for time served.

Any party having objections to the Court's proposed findings and recommendations shall serve and file specific written objections within 14 days after being served with a copy of this Report and Recommendation. See Fed. R. Civ. P. 72(b)(2). The objections

should be captioned "Objections to Report and Recommendation." A party may respond to the other party's objections within 14 days after being served with a copy of the objections. See id. The failure to object within the time limit specified shall be deemed a consent to any proposed findings of fact.

The parties are advised that, effective December 1, 2009, Rule 11 of the Rules Governing Section 2254 Cases was amended. Rule 11 now provides that in habeas corpus matters pursuant to 28 U.S.C. § 2254, the District Judge must issue or deny a Certificate of Appealability when a final order adverse to the applicant is entered. The parties may wish to take this Rule into consideration at the time they file any Objections to the Report and Recommendation.

The Report and Recommendation of a Magistrate Judge is not a final appealable order. A Notice of Appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of a judgment and/or order by the District Judge.

**IT IS SO ORDERED.**

Dated: January 21, 2020

Honorable Michael S. Berg
United States Magistrate Judge

**APPENDIX A**

1.   <u>Petitioner's declaration</u>

In his declaration attached to the FAP (FAP Exh. A at A46-A48), Petitioner stated the following:

From a young age, Petitioner saw things that no one else saw, and heard things, mostly voices, that no one else heard.  (<u>Id.</u> at A46.)  In 1995, Petitioner was using methamphetamine daily.  (<u>Id.</u>)  On the day he shot High, he remembers seeing things and hearing voices that day.  (<u>Id.</u> at A47.)  He remembers fearing for his life when High threatened him.  (<u>Id.</u>)  In the days after he shot High, Petitioner was really afraid, scared, and paranoid and just shut down.  (<u>Id.</u>)

Right after he was arrested, Petitioner had an attorney whose name was Danny Lester.  (<u>Id.</u>)  About a month after his arrest, Petitioner was moved to George Bailey.  (<u>Id.</u>)  When he was at George Bailey, Petitioner remembers hearing things, seeing things, and wanting to kill himself, so he asked for help.  (<u>Id.</u>)  Petitioner recalls being put in the rubber room for a couple of days, and then he was transferred to the psychiatric unit at George Bailey.  (<u>Id.</u>)  Petitioner was given a drug called Mellaril to help with the voices, but it gave him headaches.  (<u>Id.</u>)

Around this time, Mr. Kelley started representing Petitioner.  (<u>Id.</u>)  When Mr. Kelley met Petitioner, he was having headaches from his medication.  (<u>Id.</u>)  He told Mr. Kelley that he was on psych medication because he was hearing voices and seeing things.  (<u>Id.</u>)  Petitioner told Mr. Kelley that he had been hearing and seeing things on the day he shot High.  (<u>Id.</u>)  Mr. Kelley did not respond.  (<u>Id.</u>)  Petitioner also told Mr. Kelley that he had used a lot of methamphetamine in the days leading up to when he shot High, and that he had not slept during that time.  (<u>Id.</u>)

Mr. Kelley did not really meet with Petitioner to go over his trial testimony.  He just told Petitioner he should focus on saying he was afraid for his life.  (<u>Id.</u>)  Mr. Kelley told Petitioner not to mention his drug use.  (<u>Id.</u>)  Petitioner and Mr. Kelley never discussed

3:09-cv-01896-JM (RNB)

Petitioner talking about the things he sees or hears, including the things he saw or heard on the day he shot High. (Id.)

2. <u>friend and family testimony</u>

a. *Anthony Brown*

In his declaration (FAP Exh. A at A1-A3), Mr. Brown stated the following: He knew Petitioner from childhood and grew up in the same area of San Diego. In the early 1990's, Petitioner had the reputation of having a very serious drug problem. (Id. at A1-A2.)

b. *Jollodie Williams*

In her declaration (FAP Exh. A at A14), Ms. Williams stated the following. She is Petitioner's daughter. (Id.) She was three years old when her father was arrested in January 1995. (Id.) She does not have clear memories of that time, but she does remember her father sometimes hid in the closet. (Id.) She also remembers her grandmother visiting and taking down tin foil which had been covering the windows of the house, and that both of her parents were using drugs in the weeks before her father's arrest. (Id.)

c. *Joyce Ann Richmond*

In her declaration (FAP Exh. A at A18-A20), Ms. Richmond stated the following. She is Petitioner's ex-wife and she was married to him at the time of his conviction in 1995. (Id. at A18.) She met Petitioner when she was twelve years old and he was fourteen years old. (Id.) During that time, she remembers that Petitioner sometimes talked to himself and would get embarrassed when asked about it. (Id.) She would see Petitioner talking to himself every few months, and this behavior continued throughout the time she knew him. (Id.)

In the year before the January 11, 1995 shooting, Petitioner was using methamphetamine daily. (Id.) His mental health issues worsened in the year prior to the shooting. (Id.) He was talking to himself daily. (Id. at A19.) He was paranoid that people were watching him and out to get him. (Id.) He thought he saw people watching him, pointing at him, and talking about him, but no one was there and he was just hallucinating.

(Id.) Petitioner would sometimes hide in the closet or under the bed because he was trying to hide from these people who were not really there. (Id.) Petitioner would cover the sliding glass doors at their home so these people could not look in. (Id.) He would cover the windows with tin foil for the same reason. (Id.)

Petitioner would sometimes ask Ms. Richmond if she saw things or people that were not there, and when she would tell him that she did not, he would get agitated. (Id.) Sometimes he even pushed and hit her when confronted with the truth; that these people were just in his head. (Id.) Sometimes Petitioner would not remember what happened during a paranoid episode. (Id.)

On January 1, 1995, Ms. Richmond and Petitioner bought methamphetamine, which they used daily until January 11, 1995. (Id.) On January 11, 1995, Ms. Richmond and Petitioner used methamphetamine with Sharon Mack about thirty minutes before the shooting. (Id.) At the time of the shooting, Petitioner had not slept in days. (Id.)

After the shooting and before his arrest on January 26, 1995, Petitioner was quiet, kept to himself, and seemed to be in a state of shock. (Id.) Ms. Richmond believed Petitioner hated himself for shooting High. (Id.)

She does not remember the defense attorney or investigator asking her any questions about Petitioner's mental health or methamphetamine use at any point. (Id. at A20.) The defense attorney never asked her to testify, but she was available to testify.[19] (Id.)

### d.   Marie Anette McFarland

In her declaration (FAP Exh. A at A29-A30), Ms. McFarland stated the following. She is Petitioner's aunt. (Id. at A29.) The last time she saw Petitioner was during the year

---

[19]     The Court notes that Sharon Mack, a neighbor, testified at Petitioner's trial as a witness for the prosecution. Ms. Mack testified that she heard Ms. Richmond tell her husband to shoot High when High opened petitioner's front door and started pulling at him. (See ECF No. 10-10 at 80-81.) Mr. Kelley also represented to the trial judge during a side-bar conference that Ms. Richmond allegedly instructed Ms. Mack after the shooting: "don't call the police, [Petitioner] did it, or something like that." (See id. at 85.)

before his arrest.  (Id. at A30.)  He would not sit down and kept fidgeting.  (Id.)  She did not visit Petitioner at jail before his trial and did not attend his trial.  (Id.)  Ms. McFarland also does not remember ever speaking with Petitioner's attorney before the trial or ever being asked about his mental health.  (Id.)

> e.  *Myron Sandifer*

In his declaration (FAP Exh. A at A31-A32), Mr. Sandifer stated the following.  He is Petitioner's half-brother.  (Id. at A31.)  He recalls seeing Petitioner talk to himself when he was about eight years old.  (Id. at A32.)  In the year before Petitioner's arrest in January 1995, he saw Petitioner regularly, probably three times a week.  (Id.)  Petitioner was using methamphetamine daily, often staying up for days at a time.  (Id.)  He often got high with his wife at the time, Ms. Richmond, and with other people from the neighborhood.  (Id.)

During the year before his arrest, Petitioner was not acting like himself.  (Id.)  He was very paranoid and thought people were watching him.  (Id.)  Mr. Sandifer remembers several times when Petitioner would ask him if he saw people watching him, but no one was there.  (Id.)  Another time, when Petitioner and Mr. Sandifer were working together fixing a car, Mr. Sandifer remembers Petitioner telling him he heard something, but Mr. Sandifer had not heard anything and believes Petitioner was having an auditory hallucination.  (Id.)

Between the January 1995 shooting and his arrest, Petitioner was quiet, kept to himself, and was even more paranoid.  (Id.)  For example, Mr. Sandifer saw Petitioner about two days after the shooting, and Petitioner told Mr. Sandifer he would only talk to him in the bathroom because he was seeing things and hearing voices and only felt safe in the bathroom.  (Id.)

> f.  *Willie Pearl Williams*

In her declaration (FAP Exh. A at A40-A41), Ms. Williams stated the following.  She is Petitioner's mother.  (See id. at A40.)  She sees and hears things that other people cannot, and she has visions.  (Id. at A41.)  She believes other people in her family also have visions or gifts.  (Id.)  When Petitioner was a child, Ms. Williams often found him sleeping

under the bed rather than in the bed. (Id.) When she asked him why he did this, he told her it was so he "wouldn't see things."[20] (Id.) At the time, Ms. Williams understood this to mean that Petitioner was seeing things other people could not see or was having visions. (Id.)

In the year before Petitioner's arrest in January 1995, Ms. Williams understood that Petitioner was using drugs. (Id.) She never personally witnessed him using drugs, but he was not acting like himself and other family members told her it was because he was using drugs. (Id.) During that year, she visited Petitioner and his family frequently at their home. (Id.) Ms. Williams remembers that Petitioner told her that people were watching him. (Id.) She remembers that he had tin foil covering his windows. (Id.)

Ms. Williams does not remember ever speaking with Petitioner's attorney before the trial or ever being asked about his mental health or drug use. (Id.)

### g. Adrienne Mack Morris

In her declaration (FAP Exh. A at A42-43), Ms. Morris stated the following. She was Petitioner's neighbor in January 1995. (Id. at A42.) She remembers Petitioner had a reputation for being a drug user. (Id.) She also remembers that after the shooting on January 11, 1995, Petitioner's behavior changed and he became withdrawn and quiet, keeping to himself. (Id.) She does not recall his attorney or defense investigator asking her about Petitioner's drug use. (Id.)

Ms. Morris was called as a witness for the prosecution at trial. She did not testify about Petitioner's drug use on the night of the shooting or on any other occasion. (See ECF No. 10-11 at 64-83.)

/ / /

/ / /

_____

[20] The Court notes that Petitioner and multiple family members stated in their declarations attached to the FAP that petitioner's step-father often beat him and his family members when he was growing up. (See FAP Exh. A at A46, A29-A30, A31, A40-A41.)

### 3. Mr. Kelley's investigation and defenses

Also attached to the FAP were documents related to Mr. Kelley's pre-trial investigation. An investigator for Mr. Kelley[21] interviewed Dr. Steven Ornish, a Diplomate with the American Board of Psychiatry and Neurology with an added qualification in Forensic Psychiatry, regarding the possibility of Dr. Ornish testifying at Petitioner's trial. According to handwriting of unknown origin at the bottom of the exhibit, the consultation related to the intent to pursue a voluntary intoxication defense. (FAP Exh. D at D4-D5.) Dr. Ornish also submitted an invoice to Mr. Kelley for his time spent on "Research on methamphetamines levels and consultation, 1 hour."[22] (Id. at D5.) Dr. Ornish did not testify at trial.

Mr. Kelley's investigator also interviewed various individuals in June and July 1995 about the shooting and aftermath. Adrienne Mack-Morris, a neighbor, told the investigator that "[Petitioner] was always there to help her whenever she needed help, was always

_____

[21] Michael Okins, the defense investigator, has since passed away. (See FAP Exh. A at A53, ¶ 17(b).)

[22] The parties dispute the nature of Dr. Ornish's consultation. Respondent contends that Dr. Ornish was consulted to explore the possibility of a defense based on voluntary intoxication, based on the notations on the documents. (See ECF No. 152-1 at 15.) Petitioner contends that Dr. Ornish was contacted about High's methamphetamine use and the effect it might have on his behavior. (See ECF No. 141 at 17; ECF No. 154 at 10-12.) In this regard, the Court notes that during trial, Mr. Kelley elicited testimony from defense witness Hayes that he got "high" with High the night and early morning before the shooting. (ECF No. 10-12 at 32-33.) Mr. Kelley further elicited Hayes's testimony that in the early morning hours of the day of the shooting he and High smoked methamphetamine, and when High ran out of "dope," High said he wanted Hayes to go to petitioner's home to "jack" him, and Hayes declined. (Id. at 33-34.) Upon objection by the district attorney, Mr. Kelley asserted that this testimony was relevant to the issue of self-defense by showing High's state of mind, to wit, that an agitated High went to Jones's home to do harm or steal something. (Id. at 8-31.) Defense counsel stated "we can't sterilize it to pretend like [High] showed up on my client's front porch with a suit on, you know, trying to sell him something. This is that neighborhood. This is what was happening. This is the people. This is my client's state of mind, and the victim's state of mind I think are certainly relevant to the issue of self defense." (Id. at 22.)

46

friendly and had something nice to say to her all the time. However, after the shooting, [Petitioner] 'just shut down. He had no smiles nor anything to say to anyone.'" (Id. at D144.) Harvey Sherrill, a friend, similarly told the investigator that "[t]he day after the shooting [he] observed [Petitioner] crying and he appeared to be in shock." (Id. at D146.)

Mr. Kelley did not elicit testimony from Petitioner that Petitioner was on drugs at the time of the shooting. During closing argument, Mr. Kelley raised as a defense to the shooting the right to self-defense. (See ECF No. 10-15 at 42-58.)

No evidence has been presented that Mr. Kelley had Petitioner's mental health evaluated or investigated a mental health defense. Mr. Kelley's stipulated testimony strongly suggests he never considered Petitioner's mental health, as he "had represented clients who suffered from schizophrenia and recognized when the client was on medication he or she was fine, but if not, he or she would 'wig out.' He 'never got any of that from [Petitioner]." (ECF No. 173 at 3.)

4. Petitioner's pre-trial statement

Petitioner was arrested on January 26, 1995. (See ECF No. 10-1 at 250.) At the patrol station, Petitioner was advised of his Miranda rights and initially declined to speak with the officers. (Id.; see also ECF No. 10-2 at 9.) Petitioner stated that he understood his rights and declined to talk. (ECF No. 10-2 at 9.) He added: "There's nothing to tell. I mean if someone's going to point fingers or whatever and say false accusations or anything like that I'd like to have an attorney. You know, cause I don't want to misunderstand anything." (Id.)

Petitioner did, however, begin to make voluntary statements regarding the incident. (ECF No. 10-1 at 250.) Sometime later, while Petitioner was in a holding cell, he requested to speak with a patrol deputy sheriff he recognized. (Id.; see also ECF No. 10-2 at 10.) After speaking with this officer, he decided to make a statement regarding the shooting. (ECF No. 10-1 at 250.) After being re-advised of his rights, Petitioner talked with the officers. (Id.; see also ECF No. 10-2 at 11-13.)

///

Petitioner told police what happened on the night of January 11, 1995. (ECF No. 10-2 at 13-22.)

During his police interview, Petitioner provided a long narrative describing the evening's events, stating as follows.

> It was just my wife and I. We were upstairs. Um, the kids were in their room playing but we were in our room just talking. Discussing the move that, where we were going to live, you know, the area and what not. There was a knock at the door. A loud knock, you know, it startled me, you know. I opened up the bedroom window upstairs and I stuck my head out and I asked who is it. And they said [High]. It's [High] and Mark down here. And I said well what do you guys want. And [High] said no, no, homeboy come on down here, come on down here, and face the music. I said, I said what the hell is it now? Hey, homeboy just come on downstairs and come talk to me (unintelligible). I said if there's any problems I don't want it. Okay. He goes, this ain't gonna be a problem just get your ass down here now. And I closed the window and um I proceeded to my doorway of the bedroom. As I got to right to the top of the steps I was going down, starting to proceed down, hit the first, the second step to go down stairs and the door knob jiggled and the door opened. And he came in I immediately I went back in my room and I, I grabbed the pistol and stuck it in my pocket. I rushed downstairs and I said uh, what the fuck do you think this is. You know, you just can't come in my house like this man. This is my privacy. You know, I have my kids here. And uh, he said something about, he said she said about Billy's lady this and that you know. But Mark was standing right there, right there with him. Um, I asked him, I said um, would you please leave. He said to me uh, well why don't you just come on outside. I said well my wife and kids are here. I said we can talk about this later another day. He goes no homeboy we want to straighten this up right now. I said I asked you nicely if you could leave. I would appreciate it if you could leave please. He goes I'm not leaving no where. So I tried to close my front door. Um, he almost like, he pushed my screen door up against the palm tree I got right there in front. And um, I tried to close the front door and he just pushed the door back open and preceded in.
>
> . . .
>
> Yes. There was two different people at the door. But uh [High] was the one that uh initially, you know, opened my door and he came on in.
>
> . . .
>
> You know, so I felt threatened to . . .

48

3:09-cv-01896-JM (RNB)

. . .

Um to me I felt as if though uh he was violating my home and my . . . you know, disrespecting me by doing that. I didn't invite him in. But uh, um, I tried to close the front door and he just like tried to barge himself back in and I said don't make me do something that I don't want to do. You know, I said um this is my home and I'm the security system at my home is to protect my family. Security with my family. Um, I pointed the pistol at him and he said uh, his exact words were if you pull that you're going to have to use that. You know, I said I don't, I really don't want to do this [High]. I said don't, just leave you know, just leave. Would you please leave. I don't want no trouble with nobody. And he goes uh nah, nah, I don't think so. So I fired one time and um, it didn't hit him. And he started to run and as he, as he took off running he said um, if you don't kill me I'll kill you. It was a do or die situation. It was either me or him. You know. And I felt threatened to that fact. And he ran around a bush and came back running towards me. As he was going around the bush I fired again.

. . .

Um I don't know [if I hit him]. You know, cause it was dark. I don't' know. And he came around the bush towards me and he fell when he went around the bush and then he got up and then he start running back, you know, like towards me and he fell again right there, I said [High] I said something to him, I don't remember exactly what I said. I said something to him. And he looked at me, he, as he was scuffling back he looked at me and he goes you're gonna die. You know right there in front of my, my door right there. And then I said uh I said something I don't quite remember what I said but I said something to him, um, to the effect of I didn't' want it to come to this and um he got up and I pulled the hammer back in. He started running and I ran behind him and I hit him, hit him in the back. Well that's what they said I hit him in the back. I don't know. And then um, we got up out by the street. He, he, got like, like, not like this, you know, hands out like a dive. And um, I went out and I said [High] are you all right. You know and he, he flipped over on to his back and he raised up and he uh, his last words was to me just go ahead and take me because he would kill me.

(ECF No. 10-2 at 14-19.)

Petitioner then engaged in the following back and forth with the officer:

[Officer]:          What did you do?

[Petitioner]:       I shot him again.

| | | |
|---|---|---|
| 1 | [Officer]: | Where did you shoot him at? |
| 2 | [Petitioner]: | In the head. |
| 3 | [Officer]: | When you say the head are you talking that you're facing |
| 4 | | him? Did you shoot him in the face or in the back of the |
| 5 | | head or on top of the head. Where did you shoot him at? |
| 6 | [Petitioner]: | Well I think it was like right here. |
| 7 | [Officer]: | You're indicating on the left side of his head above the |
| 8 | | ear? |
| 9 | [Petitioner]: | Uh, yes. |
| 10 | [Officer]: | How many times did you fire towards his head? |
| 11 | [Petitioner]: | Twice. |
| 12 | [Officer]: | And this . . . do you think the first shot that struck him in |
| 13 | | the head? Did you fire quickly in other words? Or did you |
| 14 | | fire see what happened then fired again? |
| 15 | [Petitioner]: | It was . . . it happened so fast, you know, I couldn't tell |
| 16 | | you. It happened so fast. |
| 17 | [Officer]: | But you fired twice toward his head when he was there? |
| 18 | [Petitioner]: | Yes when he, when he, when he dove out and hit the |
| 19 | | ground he was on his, like you know on his face right. |
| 20 | [Officer]: | Um uh. |
| 21 | [Petitioner]: | Um on his stomach. And I walked up to him you know. I |
| 22 | | asked him you alright, you know. And he rolled over you |
| | | know. He rolled over and laid on his back and um, and I |
| 23 | | went up to him I said I didn't want it to come to this dude. |
| 24 | | He said he just told me to kill him. He was telling people |
| | | uh like a week before this even happened or anything like |
| 25 | | that, that um, that he was ready to die. Um, that he didn't |
| | | want to be suffering any longer. You know, when Danny, |
| 26 | | his, one of his homeboys, Danny Boy got killed over here |
| 27 | | in National City you know. And uh, uh Scooby, -- Terell |
| | | Walker, when Scooby got killed he said uh that he couldn't |
| 28 | | take it and that he, he just wanted to rest in peace you |

50

know. I didn't have intentions or any idea that it was going to you know, reflect back on me to being wanted. And I felt a great threat towards him whenever in his presence you know, cause he was the type of person that he just didn't care.

[Officer]:        Okay. After you fired twice at him when he was down, when he was on the street, what did you do then?

[Petitioner]:     Um, I walked away from him and I told somebody uh, just yelled out somebody call, call the ambulance you know, um he was still breathing and everything. Um, I immediately got on my son's bicycle and went down, went down the street uh I was in hysterics. I was just scared, shaking and nervous you know. I was just, I was, basically I was afraid for my life you know.

(ECF No. 10-2 at 19-22.)

Petitioner then went back over what had occurred with the officer in additional detail, and assisted him in drawing a diagram of the events. (See ECF No. 10-2 at 22-46.) On follow up questioning regarding the final shots, Petitioner testified as follows:

[Officer]:        Okay, right. So at this time how many times have you fired at him?

[Petitioner]:     Three.

[Officer]:        You fired three times including the warning shot? The shot you wanted to scare him with?

[Petitioner]:     Right.

[Officer]:        Okay. And after you fired the third shot and as he's running away toward grand Westbound and he, he falls out on the street, he, he falls out onto the street, what did you do, after you fired that third shot?

[Petitioner]:     Um, I went over to him, you know, he was breathing and I said [High] hold it, hand in there, you know, it was going to be alright. I told him I didn't want it to come to this. And he turns over and lays on his back and he's breathing, he raises up, he sits, up, he sits up okay, he just told me . .

|  |  |
|---|---|
| | . |
| [Officer]: | He said what? |
| [Petitioner]: | He told me to kill him. Go ahead and shoot me. (Unintelligible) |
| [Officer]: | Okay. Um uh. |
| [Petitioner]: | Finish him off. |
| [Officer]: | Uh hm. |
| [Petitioner]: | Stone kill him. |
| [Officer]: | And did you fire a fourth shot? |
| [Petitioner]: | I shot, did what he wanted me to do. |
| [Officer]: | Did you fire the fourth shot? |
| [Petitioner]: | Yes sir. |
| | . . . |
| [Officer]: | Okay, did you fire a fifth time? |
| [Petitioner]: | I believe I did. I could have very easily you know. |
| | . . . |
| [Officer]: | Okay, What, what happened after that fifth shot? |
| [Petitioner]: | After that um I just, I was frightened, I just, I went and got my son's bike and I went down the street to Billy's house and at that time um, I was coming across San Diego Street right here. |
| | . . . |
| [Officer]: | Before we go on any further going back to, to [High]. After those two shots were fired toward his head. What did he do? What happened? |
| [Petitioner]: | He, he didn't do anything. Uh, after he told to [me] just to finish him off he just . . . |

| | | |
|---|---|---|
| 1 | [Officer]: | You shot him twice, he doesn't say anything more? |
| 2 | [Petitioner]: | He's still breathing uh but he doesn't say anything. |
| 3 | | . . . |
| 4 | [Officer]: | I need to know what was in your mind when you fired a |
| 5 | | round at him as he was running toward Grand. He gets up, |
| 6 | | you fired two rounds already, he's running, what's in your |
| 7 | | mind? |
| 8 | [Petitioner]: | What's in my mind at the time is, is fear. You know, |
| | | fright. Um, seeing if um, now that I made the initial shot |
| 9 | | what would happen um, what's going to happen to me if |
| 10 | | he you know retaliated or came back or, all kinds of things |
| | | were going through my mind of, especially for the safety |
| 11 | | of my family you know my kids and what not. |
| 12 | [Officer]: | So are you saying that you felt committed to going through |
| 13 | | with this? |
| 14 | [Petitioner]: | I didn't feel committed. No, I wasn't, I don' know I . . . |
| 15 | [Officer]: | Well did you make a decision then I'm going, I'm going |
| 16 | | try to shoo, shoo finish him up. I'm going to try and kill |
| 17 | | him? |
| 18 | [Petitioner]: | After, well, when I walked up to him and he told me to |
| | | finish him off. You know. Other then that I was, I wasn't |
| 19 | | gonna want to do anything. |
| 20 | [Officer]: | But when he said that you decided to go ahead and shoot? |
| 21 | [Petitioner]: | He said go ahead and kill me homey. Finish me off. |
| 22 | [Officer]: | And you decided to shoot then? |
| 23 | | |
| 24 | [Petitioner]: | It just clicked. |
| 25 | [Officer]: | Pardon? |
| 26 | [Petitioner]: | I mean I thought it was empty. I thought, I don't know, I |
| 27 | | don't know, I don't know, I don't know. |
| 28 | [Officer]: | But you did fire the next two rounds right? |

[Petitioner]:        Yes sir.

(Id. at 46-49, 52, 70-71.)

After he was done with his statement, Petitioner told the police "it's not premeditated or anything like that." (ECF No. 10-2 at 113.)  When asked if there was anything Petitioner wanted the district attorney to hear from him, Petitioner stated:

> I just want the District Attorney to try and understand and put himself in my shoes, you know, in a situation like this.  It is the unexpected, you know?  I wasn't expecting it.  I've always felt danger and I've always felt like somebody's out to do somebody harm to me or something.  You know?  It's a true feeling.  I'm not the type of person to hurt anybody.  You know, I never have.  But it was a situation that was brought to me.  I tried to control it but there was no way out of it.  But in all actuality I believe if it hadn't, if I hadn't of did what I did it would have been me laying out there, or right there.

(Id. at 115.)

Petitioner was then asked: "What do you think [High] was going to do if you hadn't pulled that gun?" (ECF No. 10-2 at 115.)  Petitioner stated: "Well due to that fact that he had his shirt unbuttoned I couldn't see behind him and so I was, I didn't know if he had a knife on him or not.  But um, I believe that he would've uh did exactly what he said he was going to do[,]" which was "stab [Petitioner] in his lungs." (Id. at 115-16.)  "And so I honestly," Petitioner added, "you know, deep down inside I feel he was going to do somebody harm." (Id. at 116.)

### 5.  Petitioner's trial testimony

In his trial testimony, Petitioner described the shooting as follows:

> [Petitioner]:        When I pulled the gun out, I didn't realize, like it happened so fast.  My daughter was – luckily, she was still in the kitchen and she came out of the kitchen. I had my back turned, so I can't remember if she saw me pull the gun out or anything like that, but when I pulled it, he – when he made the threats and he wouldn't leave, so I fired a shot.
>
> [Mr. Kelley]:        And fired it at him?

54

///

| | |
|---|---|
| [Petitioner]: | Well, I pointed it at him, but then I turned it away just a little bit because I didn't – you know, I wasn't really trying to point it at him, but I was trying to scare him. |
| [Mr. Kelley]: | Did it go off? |
| [Petitioner]: | Yes, sir, it went off. |
| [Mr. Kelley]: | What happened then? |
| [Petitioner]: | He took a step back, a couple of steps back inside the threshold of the door, and I had told him to leave, and he made threats. He just kept making threats, idle threats. |
| [Mr. Kelley]: | You mean verbal or physical? |
| [Petitioner]: | Verbally, verbal threats. |
| [Mr. Kelley]: | Did he leave? |
| [Petitioner]: | He stepped outside and he proceeded to run. |
| [Mr. Kelley]: | And where did he run to? |
| [Petitioner]: | Well, outside the front door, there's a bush on my side. There's a bush on the other side between the fence and the sidewalk, and he ran around that bush right there. He said, "I'll be back to kill you and your whole family." I put that on myself and everything I love and this and that, and I took him serious, you know. He was – I took him real serious and I wasn't playing any games, you know. |
| [Mr. Kelley]: | And what did you do? |
| [Petitioner]: | At that time I fired another shot, and he hit – like tripped over something, and he got back up, and he says, "If you don't' kill me, I will kill you. I will kill you." |
| [Mr. Kelley]: | When he said that, after this second shot, were you still in your apartment or where you out of your apartment? |
| [Petitioner]: | I was outside. |

3:09-cv-01896-JM (RNB)

|  |  |  |
|---|---|---|
| 1 | | . . . |
| 2 | [Mr. Kelley]: | Now, where did [High] go after he ran around the bush? |
| 3 | [Petitioner]: | Well, he ran around the bush and he came back up face- |
| 4 | | to-face with me. |
| 5 | [Mr. Kelley]: | Back looking towards your apartment? |
| 6 | [Petitioner]: | Coming towards me. |
| 7 | [Mr. Kelley]: | And you were still on – let's put it, you were still under |
| 8 | | the overhang that hangs over your front door? |
| 9 | [Petitioner]: | Yes, sir. . . . |
| 10 | | |
| 11 | | . . . |
| 12 | [Mr. Kelley]: | What happened next? |
| 13 | [Petitioner]: | When he ran around the bush, he came charging back |
| 14 | | towards me, directly at me. And I could see, well, his eyes. |
| 15 | | You could see his eyes. He's got a rage in his eyes, and |
| 16 | | when he ran towards me, I guess I don't know if he |
| 17 | | knocked me into the fence or not into the fence, but into |
| 18 | | the wall some kind of way. He – I moved and he nudged |
| 19 | | me, and then he hit the ground again in front of the |
| 20 | | apartment where the overhang – |
| 21 | [Mr. Kelley]: | He fell? |
| 22 | [Petitioner]: | Yes, sir. |
| 23 | [Mr. Kelley]: | What did you do? Let me – well, he touched you? |
| 24 | [Petitioner]: | He could have. It's hard to say because it happened so |
| 25 | | fast. |
| 26 | [Mr. Kelley]: | This – the incident that you're talking about after the first |
| 27 | | shot -- |
| 28 | [Petitioner]: | Yes, sir. |
|  | [Mr. Kelley]: | -- Fires. |
|  | | You fired more than one shot? |

56

| | | |
|---|---|---|
| 1 | [Petitioner]: | Yes, sir, I did. |
| 2 3 | [Mr. Kelley]: | Between the time you fired the first shot and the last time, how much time? |
| 4 | [Petitioner]: | About 30 seconds. |
| 5 | [Mr. Kelley]: | So we're talking a very short period of time? |
| 6 | [Petitioner]: | Very, very short. |
| 7 8 | [Mr. Kelley]: | And after he fell down, then, in the area of the front porch, what happened next? |
| 9 10 11 | [Petitioner]: | He scuffled back and he just kept threatening, kept the threats, and he was – I was sure that when he said he was going to do something, he was going to do it. |
| 12 | [Mr. Kelley]: | Had you ever seen him in possession of weapons before? |
| 13 | [Petitioner]: | Yes, sir, I have. |
| 14 | [Mr. Kelley]: | Guns? |
| 15 | [Petitioner]: | Yes, sir, I have. |
| 16 17 | [Mr. Kelley]: | Did you ever see where he carried guns? |
| 18 | [Petitioner]: | Yes, sir, I have. |
| 19 | [Mr. Kelley]: | Where did he carry guns that you had observed? |
| 20 | [Petitioner]: | In his waistband. |
| 21 | [Mr. Kelley]: | How about did you ever see him in possession of knives? |
| 22 | [Petitioner]: | Yes, sir, I have. |
| 23 24 | [Mr. Kelley]: | More than one occasion? |
| 25 | [Petitioner]: | Yes, sir, I have. |
| 26 | [Mr. Kelley]: | And where did he carry knives? |
| 27 | [Petitioner]: | In his back pocket. |
| 28 | [Mr. Kelley]: | He falls down on the front porch area. What happens next, |

3:09-cv-01896-JM (RNB)

| | | |
|---|---|---|
| 1 | | if you can remember? |
| 2 | [Petitioner]: | As he was scuffling back, he was making promises: "I promise you I'll be back. If you don't kill me, I'll promise you I'll be back to kill you and your whole family." |
| 3 | | |
| 4 | | |
| 5 | [Mr. Kelley]: | And what did he do? |
| 6 | [Petitioner]: | He got up and he started running. |
| 7 | | . . . |
| 8 | [Mr. Kelley]: | And what, if anything, did you do? |
| 9 | [Petitioner]: | Well, taking the threats real serious upon me and my family, I proceeded after him. |
| 10 | | |
| 11 | [Mr. Kelley]: | And what happened? |
| 12 | [Petitioner]: | I fired another shot. |
| 13 | [Mr. Kelley]: | And what happened? |
| 14 | | |
| 15 | [Petitioner]: | It was dark. I couldn't tell if it had hit him or not, so I didn't know if it had hit him or not, but I don't know if it's visible, but on Grand, a sidewalk – the curb sticks off the sidewalk about that high. And to me, it looks like he tripped. |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | . . . |
| 20 | [Mr. Kelley]: | And what happened next? |
| 21 | [Petitioner]: | I went out to where he was, and he was laying – like he was laying not on his face down, but he was laying on the side, but he was on his stomach. |
| 22 | | |
| 23 | [Mr. Kelley]: | When he was laying in the street, did you see any blood? |
| 24 | | |
| 25 | [Petitioner]: | No, sir, I did not. |
| 26 | [Mr. Kelley]: | Did you see any bullet hole in his clothing? |
| 27 | [Petitioner]: | No, sir, I did not. |
| 28 | [Mr. Kelley]: | Did he say anything about having been shot? |

58

| | | |
|---|---|---|
| 1 | [Petitioner]: | No, sir, he did not. |
| 2 | [Mr. Kelley]: | What happened next after you came upon him in the |
| 3 | | street? |
| 4 | [Petitioner]: | I walked up to him and I asked him, I said, "[High] are you |
| 5 | | all right?" |
| 6 | [Mr. Kelley]: | Did he say or do anything? |
| 7 | [Petitioner]: | He didn't say anything right then and there, but as he was |
| 8 | | started to turn over – and as he was turning over I was |
| 9 | | standing right like next to him, a foot away from him, and |
| | | he said, "mother fucker, I told you if you didn't kill me |
| 10 | | that I would be back to kill you." As he rolled over, he |
| 11 | | reached for me and as he reached for me it was like a |
| | | reaction pop, pop. Two times. |
| 12 | [Mr. Kelley]: | You fired twice? |
| 13 | [Petitioner]: | Yes, sir. |
| 14 | [Mr. Kelley]: | Between the time he rolled over and the two shots that you |
| 15 | | fired, how much time expired? |
| 16 | [Petitioner]: | It was just that quick. |
| 17 | [Mr. Kelley]: | It happened in an instant? |
| 18 | [Petitioner]: | It happened in an instant. |
| 19 | | |
| 20 | | . . . |
| 21 | [Mr. Kelley]: | After those two shots were fired, did he in any other way |
| 22 | | threaten you or your family? |
| 23 | [Petitioner]: | No, sir, he did not. |
| 24 | [Mr. Kelley]: | Now, at the time you fired the first shot inside the |
| 25 | | apartment? |
| 26 | [Petitioner]: | Yes. |
| 27 | [Mr. Kelley]: | At that time, why did you fire the gun? |
| 28 | [Petitioner]: | I fired the gun out of fear of being threatened and fear for |

1    my family being threatened and hurt.

2   (ECF No. 10-12 at 95-108, ECF No. 10-13 at 4.)

3        On cross-examination, Petitioner stated that he shot High in the street because "he

4   was still eminent [sic] danger, a threat to me."  (ECF No. 10-13 at 50.)  The prosecutor

5   then played the tape of Petitioner's pretrial statement during which he said that High asked

6   him to kill him.  (See id. at 54-59.)  Then the prosecutor proceeded to ask follow up

7   questions.

8

9        [Prosecutor]:          When you talked to Detective Camacho, for all practical
                                 purposes, you admitted to executing [High].  Today in
10                               court when you are on trial, you are now saying that I
                                 didn't execute him, that it was self defense.  Which was it,
11                               execution or self defense?

12       [Petitioner]:          Self defense.

13

14                              . . .

15       [Prosecutor]:          Sir, were you lying to Detective Camacho, "yes" or "no"?

16       [Petitioner]:          I could have been.  I don't know.

17       [Prosecutor]:          You don't know.  Okay.  When you told Detective
                                 Camacho that he was ready to die, that he didn't want to
18                               be suffering any longer, well is that the story?

19

20       [Petitioner]:          That is what I told him that I heard that.

21                              . . .

22       [Prosecutor]:          Okay.  [High], according to you, said finish him off, stone
                                 kill him, right?
23

24       [Petitioner]:          He told me if I didn't kill him that he would come back
                                 and kill me and my family.
25

26       [Prosecutor]:          Did [High] say finish him off?

27       [Objections, overruled.]

28       [Petitioner]:          Yes.

| | | |
|---|---|---|
| [Prosecutor]: | He told you to finish him off? |
| [Petitioner]: | Yes. |
| | . . . |
| [Prosecutor]: | So there is a big difference between somebody saying "finish me off" as opposed to "if you don't kill me, I am going to get you," isn't there?  Would you agree on that? |
| [Petitioner]: | There is – a threat is a threat. |
| [Prosecutor]: | Sir, it's real simple in this courtroom.  I ask the question and you answer them.  Is there a difference between saying "finish me off" and "you don't shoot me, I am going to kill you and your family"; is there a difference between that? |
| [Petitioner]: | Between two? |
| [Prosecutor]: | Yeah. |
| [Petitioner]: | I don't' see any difference. |

(Id. at 60-65.)

> 6.    closing arguments and jury instructions

In the prosecutor's closing argument, he explained to the jury the elements of first degree murder, second degree murder, and manslaughter in California.  (See ECF No. 10-14 at 24-34.)  With regard to voluntary manslaughter, the prosecutor explained:

> Every person who unlawfully kills another human being without malice aforethought but with an intent to kill is guilty of voluntary manslaughter in violation of 192(a) of the Penal Code.  There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the honest or unreasonable belief in the necessity to defend oneself against eminent peril to life or great bodily injury.  Notice the word is honest but unreasonable belief.

(Id. at 31.)

The prosecutor continued, applying the law to the facts as follows:

/ / /
/ / /

/ / /

/ / /

You have to ask yourself, did the defendant have an honest belief that he could turn around – that he needed to defend himself when [High] was leaving? Did he have an honest belief that he had to defend him[self] as [High] was lying in the street with a bullet in his back? Did he have an honest and reasonable belief, when you hear the version on the tape when the defendant said finish me off, homey.

In order to prove such a crime, each of the following elements must be proved: human being was killed, the killing was unlawful, the killing was done with the intent to kill.

Killing is unlawful if it was neither justifiable nor excusable. The People contend it was unlawful, because self-defense is not an issue in this case. It evaporates at a certain point in time.

The killing was done with the intent to kill. Obviously it was. You don't shoot somebody in the head twice without an intent to kill.

(Id. at 31-32.)

In Mr. Kelley's closing argument on behalf of Petitioner, Mr. Kelley argued the following:

This is not about murder. You will be read an instruction that says a person, something to the effect, that a person who kills another in the actual although it be unreasonable belief in a necessity to defend himself from imminent danger is not -- does not have the malice aforethought is not guilty of murder. He talks to you about malice as if it's something that is a given in this case.

Malice aforethought is about deliberation. Thinking. Weighing. Deciding.

. . .

That is a process or that deliberation is a mental process that you must look at and judge as it relates to [Petitioner] under the facts and circumstances that were presented to him on that evening. And I don't think from the facts you have heard that we have heard that kind of evidence. I think quite to the contrary.

What you have heard is evidence of suddenness, of unexpectedness, of heated passionness, of quick actions, of fast things. That is the environment that you – where [Petitioner's] actions were about. They were not about

premeditated or deliberate or malice type of situation.  The facts don't indicate murder.  That is not what this case is about, I would suggest to you.  Doesn't even look like murder.

(Id. at 45-47.)

Mr. Kelley then stated to the jury "You will be asked to judge [Petitioner's] actions by reasonable under the circumstances." (Id. at 51.)  Mr. Kelley then marched the jury through Petitioner's actions on the night of the shooting, explaining how each step was reasonable.  (See id. at 51-57.)  Mr. Kelley argued that it was reasonable for Petitioner to be afraid when High came to his door, stating: "[Petitioner] was trembling and he was shaking because he was in real apparent fear for his own safety and that of his family.  It was real and it was apparent." (Id. at 53.)  Recounting High's attempts to enter Petitioner's house, Mr. Kelley argued "Now I don't think it's too unreasonable to assume the adrenaline, the terror and the fear is going pretty rampant right now." (Id. at 54.)  Then, in making the case for self-defense, Mr. Kelley argued:

> The instruction talks about the right to self-defense ending when the threat is no longer apparent.  When was it no longer to [Petitioner] or a reasonable person under those circumstances"? [Petitioner] didn't even know the bullet had hit [High] in the back.  Why should he?  You know, what we have is the guy running and tripping, or -- and falling down, no reason to assume that he had hit him.

> [Petitioner] came up to [High].  [High] was rolling over and he made a motion towards [Petitioner], asked -- so there is still threats.  He is still threatening physically.  At that point he says you better finish me off or I am going to kill you and your family.  Boom, boom.  Not animation, folks, real life.

> [The prosecutor] is giving you transcripts and play tapes for you.  Look at them.  Listen to him.  You know, has [Petitioner] ever said he didn't shoot this [High]?  Where was the gun found?  Same place it always was.  [Petitioner] did not commit a crime.  This is not murder, and if it be manslaughter, he has the right to self-defense.  It's not an unlawful killing.  If there ever was a killing that was excusable, this is it.

(Id. at 54-55.)

In rebuttal, the prosecutor added:

> Mr. Kelley says the facts do not indicate murder. Doesn't look like murder.
>
> Ladies and gentlemen, he shot him in the back. He walked up to him and shot him in the head twice. Once just below the eye, the other on the side of the head. That doesn't look like a murder?
>
> . . .
>
> Basically, there is [sic] two versions as to what happened. One that he shot him in self-defense while he was laying in the gutter, or it was a mercy killing. Neither one of them don't make sense.

(Id. at 63, 66-67.)

The trial court instructed the jury on several jury instructions related to self-defense and imperfect self-defense, including, *inter alia*: Threats and Menaces (CALJIC 4.40); Voluntary Manslaughter (CALJIC 8.40 (1989 Revision)) (includes reference to imperfect self-defense); Murder and Manslaughter Distinguished (CALJIC 8.50)) (includes reference to imperfect self-defense); Justifiable Homicide in Self-Defense (CALJIC 5.12 (1994 Revision)); Justifiable Homicide – Lawful Defense of Self or Another (CALJIC 5.13); Homicide in Defense of Member of Family (CALJIC 5.14); Actual But Unreasonable Belief in Necessity to Defend – Manslaughter (CALJIC 5.17 (1994 Revision)); and Self-Defense Against Assault (CALJIC 5.30). (See ECF No. 10-1 at 59-145.)

   7.   Petitioner's mental health experts

      a.   *Dr. Stacey Wood*

In support of Petitioner's equitable tolling claim, Dr. Stacey Wood, a clinical neuropsychologist, performed a battery of neuropsychological and intellectual functioning tests on Petitioner on May 30 and 31, 2012, and summarized her findings in a "Neuropsychological Evaluation." (See FAP Exh. C at C24-C64.) In addition to personally examining Petitioner, Dr. Wood reviewed court documents, Petitioner's high school transcript, Petitioner's medical records from 1995 to 2012, and Petitioner's probation report from 1995. (See id. at C40.)

From 1995 to the present, Dr. Wood noted that descriptions of Petitioner's psychiatric presentation in his medical records was "remarkably consistent across settings

3:09-cv-01896-JM (RNB)

and clinicians and reveal[ed] an individual with severe mental illness including psychosis, PTSD, and significant depression." (FAP Exh. C at C41-C42.) Dr. Wood opined that Petitioner had an IQ in the mildly intellectually disabled range with a Full Scale IQ at 57. (Id. at C45.) Tests of executive functioning indicated that Petitioner's "thinking [was] slow, concrete and rigid." (Id. at C48.) Dr. Wood opined that Petitioner would have "difficulty with initiation, retrieval of information, sequencing information and connecting the dots in his day to day decision-making." (Id. at C48-C49.)

Dr. Wood further noted "severe cognitive defects" in visual memory, attention, visuo-spacial abilities and executive functioning. (FAP Exh. C at C50.) Dr. Wood opined that Petitioner had "a very limited repertoire of problem solving approaches and [was] poor at adapting when they [were] unsuccessful." (Id. at C51.)

In addition to low intellectual abilities and limited literacy, Dr. Wood noted that Petitioner had a long standing diagnosis of psychiatric illness. (Id. at C51.) Dr. Wood further noted that Petitioner "was first treated for psychosis in prison, but records indicated he reported that he began hallucinating approximately one year prior to incarceration. (Id. at C51.) Dr. Wood also noted that Petitioner had a history of 10-year methamphetamine addiction. (Id. at C52.)

Based on her testing and review of documents, Dr. Wood opined that Petitioner had deficits in neuropsychological functioning from 1995 to 2012. (FAP Exh. C at C52.)

       *b.*    *Dr. George W. Woods, Jr.*

       i.   <u>August 20, 2012 Report</u>

In support of Petitioner's equitable tolling claim, Dr. George W. Woods, Jr., a licensed physician specializing in neuropsychiatry, performed a neuropsychiatric examination on Petitioner on April 18, 2012. (<u>See</u> FAP Exh. C at C1-C23.) In his report, dated August 20, 2012, Dr. Woods summarized his findings and opined on Petitioner's ability to follow through on his desire and ability to challenge his conviction in federal court. (<u>See</u> <u>id.</u> at C4-C23.)

In the report, Dr. Wood opined that Petitioner was "a profoundly impaired man with

significant mental and cognitive impairments." (FAP Exh. C at C6.) Dr. Woods further opined that Petitioner had "an IQ of 57, placing him squarely in the [mildly] mentally retarded range," adding that Petitioner had "cognitive deficits in being able to read, write, and comprehend . . . ." (Id.; see also id. at C15.)

### ii.    January 4, 2016 Report

In a second report dated January 4, 2016, Dr. Woods opined on the question of whether Petitioner suffered from mental disorders and/or deficits at the time of the offense for which he was tried and convicted. (FAP Exh. C at C65-C75.) Dr. Woods summarized his findings as follows:

> It is my professional opinion, which I hold to a reasonable degree of neuropsychiatric certainty, that [Petitioner, at the time of the offense, suffered from] . . . long standing cognitive impairments, specifically, his impaired ability to weigh and deliberate and his disinhibition. His deficits are documented in his testimony and corroborated by Dr. Wood's neurological testing.

(Id. at C65.)

Dr. Woods noted that Dr. Wood's testing documented significant challenges in Petitioner's ability to effectively weigh and deliberate, sequence his thinking, and inhibit his thinking and behavior. (Id. at C67.) Dr. Woods further noted that Petitioner had demonstrated cognitive deficits since childhood, mentioning Petitioner's poor academic functioning and difficulty learning. (Id. at C67.) Dr. Woods also noted Dr. Wood's opinion that Petitioner had "significant impairments in executive functioning," which affected Petitioner's "ability to effectively weigh and deliberate decisions, to inhibit one's thoughts and actions, to effectively understand the big picture." (Id. at C68.)

Dr. Woods also highlighted Petitioner's "significantly impaired" processing speed, which is "the ability to learn things at a pace that allows him to understand and put them in proper perspective." (Id.) Concerning his opinion that Petitioner had an unreasonable belief that High continued to be capable of attacking him until he shot him, Dr. Woods stated the following:

3:09-cv-01896-JM (RNB)

/ / /

[Petitioner] also perseverates, which is the uncontrollable repetition of a response to a stimulus that is often caused by brain injury or organic brain disorder. In essence the individual gets stuck on a word or idea. This is directly relevant to [whether Petitioner had an] honest, but unreasonable response to [High's] provocations. In this situation, he got stuck and was unable to switch his thinking or reconsider his actions. This cognitive defect, a function of poor frontal lobe functioning, was captured in multiple tests he took.

(Id.)

Dr. Woods elaborated as follows:

On the day of the offense, [Petitioner's] cognitive defects were demonstrated by his inability to adequately understand the circumstances he was facing. His brain deficits were compounded by his chronic methamphetamine use. Substance abuse further undermined his cognitive abilities and enhanced his paranoia.

. . .

[Petitioner] had been using methamphetamine for years. This drug is unique in its ability to maintain psychotic thinking long after the drug use has stopped. It has comorbid properties on the frontal lobe which would exacerbate [Petitioner's] cognitive defects.

. . .

. . . Throughout [Petitioner's] cross examination, signs of his cognitive impairment are evident. His perseveration is shown in his inability to stay inside his home when a "reasonable" person would have. [Petitioner's] disinhibition and his inability to effectively weigh and deliberate are well-illustrated.

. . .

[Petitioner's] testimony also reveals his neurologically-derived difficulty stopping his behavior. In much the same way a basketball bounces several times rather than once dropped, [Petitioner's] thoughts continued to bounce after the moment had passed.

. . .

Throughout his testimony, [Petitioner] demonstrated impaired executive functioning. This is consistent with defective disinhibition, i.e., the inability

67

to stop a behavior, such as [] continuing to check a door that has been checked multiple times[]. Defective disinhibition is seen in neuropsychological testing, specifically the Go/NoGo testing on the Montreal Cognitive Assessment, as well as errors of omission and commission on multiple assessments. Errors of omission occur when a person should act, but does not not [sic]. Errors of Commission occur when a person acts, but should not act. Dr. Wood documented these types of impairments in tracking, weighing and deliberating, inflexible thinking, and perseveration that are also illustrated in [Petitioner's] trial testimony, as well as in his behavior the night of the offense.

. . .

[Petitioner] demonstrated numerous times during his testimony what was, tragically, seen on the night of the offense: . . . his significant cognitive deficits and severe methamphetamine intoxication . . . .

(Id. at C69-C73.)

Dr. Woods' forensic conclusion was summarized as follows:

It is my professional opinion, which I hold to a degree of neuropsychiatric certainty that [Petitioner] suffers from significant deficits in his executive functioning. This impacts his ability to effectively weigh and deliberate, sequence his thinking and behavior, and causes him to get stuck. [Petitioner] has demonstrated concrete thinking and disinhibition. At times, he seems unable to respond in a reasonable manner. His reactions were honest, but unreasonable. His cognitive deficits are captured in his testimony and corroborated by his social history and neuropsychological testing.

(Id. at C75.)

8. Respondent's mental health expert

In a report dated September 13, 2018, Respondent's mental health expert, Daniel A. Martell, Ph.D., ABPP, provided a "second opinion" regarding the conclusions of Dr. Wood and Dr. Woods. (See ECF No. 165-1.) Dr. Martell did not personally examine or test Petitioner, but reviewed case materials provided to him by Respondent. (See id. at 1.)

Based on his review, Dr. Martell came to the following opinions to a reasonable degree of psychological certainty:

I agree with Dr. Stacey Wood's conclusion that [Petitioner] meets diagnostic criteria for Intellectual Disability, based on: (1) his IQ test score; and (2) evidence of impairment in his Conceptual adaptive functioning, which (3) dates back to his school-age years.

I also concur with her opinion that [Petitioner] suffers from neuropsychological impairments in multiple areas including executive functioning, memory, attention, and visual processing. These deficits are consistent with his level of IQ functioning, and further support his diagnosis of Intellectual Disability.

I note that Dr. Wood administered tests designed to detect malingering or faking, and that [Petitioner] "passed" those tests, indicating a valid effort and reliable test findings. In addition, I reviewed Dr. Wood's raw IQ and neuropsychological test data for so-called "embedded" measures of effort, and found that [Petitioner] also passed on those indicators, again reflecting valid effort and reliable test findings.

I agree with Dr. George Woods' conclusion that [Petitioner] has a history of suffering from mental illness, including schizophrenia, schizoaffective disorder, depression, and PTSD.

I agree with Dr. George Woods' opinion that [Petitioner] was a chronic methamphetamine user, and that the use of methamphetamine would have served further to undermine his intellectual and cognitive deficits, and to potentially exacerbate his psychiatric symptoms.

In my opinion, Dr. George Woods' finding that [Petitioner's] behavior during the instant offense reflected frontal lobe dysfunction and "perseveration" while speculative, is not out of the realm of possibility and as such may have been helpful to the trier-of-fact at trial.

I do not believe that [Petitioner's] repeated trigger-pulls specifically indicate some sort of frontally-mediated motor perseveration. Rather, there may have been frontally-mediated *ideational* perseveration on the thought that [High] presented an imminent threat requiring deadly force. I see the following strengths and weaknesses underlying that argument:

Strengths:

(1)   Mr. Jones clearly does suffer from Intellectual Disability and cognitive dysfunction, including frontal lobe dysfunction as described by Dr. Stacey Woods.

(2)     His history of mental disorder and methamphetamine abuse is also legitimate and well documented.

(3)     Given those impairments, it is not unreasonable to conclude that his capacity to reflect on his behavior and assess the threat presented by [High] was impaired.

Weaknesses:

(1)     There is no evidence that [Petitioner] was out of touch with reality at the time of the offense, (i.e., he was not psychotic) despite his psychiatric diagnoses and any acute or chronic effects of methamphetamine at that time. However, despite the absence of such "positive symptoms," so-called "negative symptoms" of schizophrenia that affect interpersonal relatedness could still have played a role in [Petitioner's] perceptions at the time.

(2)     The shooting occurred in several discreet episodes, including: (a) the warning shot at the door, (b) the shot as [High] allegedly ran back at [Petitioner] from a bush, (c) the shot in the back as [High] began to run away, and (d) the shots to the head as [High] lay on the ground. [Petitioner's] statements indicate that he made assessments at each of these points as to [High's] degree of injury or incapacitation, that he was able to listen to what [High] was saying, and that his subsequent behavior (i.e. additional gunshots) was informed by what he claims [High] said to him. Hence, he was not simply an automaton. On the one hand, [High's] alleged statements may have served to reinforce [Petitioner's] belief that [High] presented an imminent if not immediate threat to him. Ultimately, a determination of whether [Petitioner's] belief that there was an imminent threat posed by [High] was reasonable for a person with his intellectual, cognitive, and psychiatric impairments is a question for the trier of fact. On the other hand, [Petitioner's] statements that the *coup de grace* shots were made in response to a request by [High] to go ahead and kill him would not be consistent with an ongoing belief that [High] presented an imminent threat.

(3)     The accuracy of [Petitioner's] account of [High's] statements as he lay on the ground is possibly called into question by the observation of witness Mark Robinson, who described [High] as raising his arm in what could have been a defensive posture prior to the final shots to the head, which could be at odds with either asking [Petitioner] to kill him, or threatening [Petitioner] with harm. However, absent more concrete

evidence, this would be a speculative conclusion as well.

(ECF No. 165-1 at 2-4.)