UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER JONES,<br><br>                              Petitioner,<br><br>v.<br><br>MATTHEW CATE,<br><br>                              Respondent. | Case No.:  3:09-cv-1896 JM (MSB)<br><br>**ORDER (1) ADOPTING REPORT AND RECOMMENDATION; (2) REJECTING RESPONDENT'S OBJECTIONS; (3) GRANTING IN PART THE FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS** |

Christopher Jones ("Petitioner") is a state prisoner who originally filed a *pro se* Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  Following remand from the Ninth Circuit, a First Amended Petition for Writ of Habeas Corpus ("FAP") was filed on January 16, 2016.  (Doc. No. 141).  The matter was referred to United States Magistrate Judge Michael S. Berg pursuant to 28 U.S.C. § 636(b)(1)(B).  Magistrate Judge Berg issued a Report and Recommendation ("R & R") recommending the court grant the amended petition as to Claim One but deny

it with respect to the Second Claim.  (Doc. No. 176 at 39.[1])  Respondent filed Objections to the R & R.  (Doc. No. 36.)

Following *de novo* review of Petitioner's claims, the court finds the R & R to be thorough, complete, and an accurate analysis of the legal issues presented in the amended petition.  For the reasons explained below, the court: (1) adopts the R & R in full; (2) rejects the Respondent's objections; (3) grants the FAP as to Claim One; and (4) denies the FAP as to Claim Two.

## I.   BACKGROUND

### A.  Factual Background

The R & R contains an accurate recital of the facts as determined by the California Court of Appeal, and the court fully adopts the R & R's statement of facts.  However, in order to provide context, the court will repeat the summary compiled by Magistrate Judge Berg from the "Facts" section of the California Court of Appeal opinion:

> Jones lived with his wife and children in an apartment in a neighborhood where people commonly sought to show their toughness by making threats. Jones knew [Michael Anthony] High ["High"] from the neighborhood.  Jones did not act as if he were afraid of High.
>
> On one occasion, while Jones was working on a truck, High played with a revolver and said to Jones, "You would never know if I come up and shoot [sic] you, would you?"  On another occasion, while Jones was emptying trash, High said to Jones, "I could have struck you, could have just … stabbed you." High did not act on those threats.
>
> On a later occasion about 8 p.m. on January 11, 1995, High and Mark Robinson arrived at Jones's apartment and knocked loudly on the front door. Jones went to an upstairs window and asked who was there.  Robinson said, "It's me, blood."[2]  Jones went downstairs and opened the door.  Robinson told

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

[2] In the neighborhood, the term "blood" meant friend.

2

Jones, "Get my money." Jones told Robinson he would be the first to know when Jones got Robinson's money. Robinson walked away.

Asking Jones about a rumor that Robinson made sexual advances toward the girlfriend of another man, High said, "What is up with that he-said-she-say-shit?" High opened the screen door and began pulling on Jones. Jones extricated himself and pushed High outside. Jones's wife said, "Shoot him." As High tried to enter the apartment, Jones again pushed him outside. Remaining outside, High yelled at Jones to come outside and shouted obscenities about Jones's wife.

Angered, Jones went outside where he and High swung at each other but missed. Jones then pulled a gun from his pocket and shot into the air. High ducked and rolled to the ground. As High rolled on the ground, Jones chased High and shot him.

Trying to run away, High hopped over two fences. Jones chased High and fired another shot. High's back arched, his arms went back, and his chest thrust forward as he fell face first into the street having been shot in the back. When High rolled over onto his back in the street, Jones approached and stood over him. Standing less than a foot from High, Jones shot him three times in the face.[3] Although High was still breathing, Jones walked away from him without offering medical assistance or seeking to summon an ambulance. Jones then rode away on a bicycle.

Paramedics arriving at the scene did not find any weapons on High's person.

On January 13, 1995, about 7 p.m., High died from multiple gunshot wounds.

On January 26, 1995, a deputy sheriff searched Jones's apartment and found a gun. A comparison of the bullets fired from Jones's gun and four missile fragments removed from High's body was inconclusive but indicated High could have been shot with Jones's gun.

R & R at 6-7; (*see also* Doc. No. 10-3 at 2-4).

---

[3] The Court notes that although the Court of Appeal opinion states that petitioner shot High three times in the face, the evidence presented at trial and the arguments contained in the FAP and Answer Memorandum indicate that Petitioner only shot High twice in the face. (*See* Doc. No. 141 at 6, 8, 14; Doc. No. 152-1 at 6; Doc. No. 10-11 at 174-75; Doc. No. 10-12 at 107.)

**B.  State Procedural Background**

The R & R contains a complete and accurate summary of the state court proceedings, and the court fully adopts the R & R's statement of state procedural background.

**C.  Federal Procedural Background**

An accurate history of the legal proceedings between the filing of the original pro se Petition for Writ of Habeas Corpus and the issuance of Magistrate Judge Berg's R & R on the FAP is set forth within it at pages 1-4, so the court need not repeat them here.  The court fully adopts the R & R's statement of the federal procedural background preceding the R & R's issuance and the interceding state court procedures.

The FAP, filed on January 16, 2016, challenges Petitioner's San Diego County Superior Court conviction for second degree murder.  (Doc. No. 141.)  Petitioner alleges two ineffective assistance of counsel claims and an instructional error claim[4], while conceding the two ineffective assistance of counsel claims were not presented to the state courts.   Claim One alleges that trial counsel provided ineffective assistance by not investigating and presenting a mental-health based defense.   Claim Two alleges trial counsel provided ineffective assistance by not moving to have Petitioner declared incompetent to stand trial.  After Petitioner exhausted his state court remedies and returned to this court, Respondent filed his answer to the FAP on September 22, 2019.  (Doc. No 152, 152-1.)  On October 16, 2017, Petitioner filed a Traverse.  (Doc. No. 154.)

Following several status conferences, an evidentiary hearing was set for February 6, 2019, to help decide Petitioner's ineffective assistance of counsel claims on the merits.  (Doc. Nos. 157, 159, 166, 171, 172.)   The parties subsequently submitted several stipulations regarding the admissibility of evidence and the testimony of trial counsel, and Magistrate Judge Berg vacated the evidentiary hearing and took the matter under submission.  (Doc. No. 175.)

---

[4] Petitioner conceded that his instructional error claim failed on the merits, therefore, it was not addressed in the R & R.  *See* R & R at 2.

On January 21, 2020, Magistrate Judge Berg issued an R & R which recommended the FAP be denied as to Claim Two.  (R & R at 39.)  With respect to Claim One, it was recommended that:

> Petitioner shall be discharged of all consequences of his second degree murder conviction in San Diego Superior Court Case No. ECR11253 unless either (a) he is brought to trial and retried on the second degree murder charge within sixty (60) days or such additional time as state law allows, or (b) the judgement of conviction in San Diego Superior Court Case No. ECR11252 is reduced from second degree murder to manslaughter and petitioner is resentenced accordingly (including on the personal use of a firearm enhancement) with credit for time served.

R & R at 39.

On March 5, 2020, after being granted an application for enlargement of time, Respondent filed his Objections.  (Doc. No. 179).  Within his objection, Respondent argues that the magistrate judge erred in not adequately deferring to the reasonable tactical decisions of counsel.  Relatedly, Respondent asserts that Petitioner has not met his burden of showing that counsel's performance was deficient nor has Petitioner demonstrated that the alleged deficient performance resulted in prejudice.

Petitioner did not object to the magistrate judge's recommendation that the court deny relief on Claim Two.

## II.   DISCUSSION

### A.  Legal Standard

The R & R sets forth the correct standard of review for a petition for writ of habeas corpus.  28 U.S.C. § 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 403, 123-13 (2000).

By virtue of there being no state court adjudication of the merits of the two ineffective assistance of trial counsel claims, the governing standard of review for those claims is *de novo.   See Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003) (the deferential standard of the Antiterrorism and Effective Death Penalty Act ("AEDPA") does not apply when the state court does not issue a decision on the merits); *Pirtle v. Morgan,* 313 F.3d 1160, 1167 (9th Cir. 2002) ("[W]hen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo."); *see also, e.g., Williams v. Ryan*, 623 F.3d 1258, 1264 (9th Cir. 2010) (where denial of state court claim is on inadequate procedural ground, "[t]he deference AEDPA requires for state court determinations … does not apply and [federal court] review of [the] claim is de novo").

**B. Analysis of Petitioner's Claims**

Petitioner raises two claims in his FAP, both based on purported violations of his Sixth Amendment constitutional right to effective assistance of counsel.  Specifically, he claims: (1) ineffective assistance of counsel based on trial counsel's failure to investigate and present a mental-health based defense (FAP at 27-34); and (2) ineffective assistance of counsel based on trial counsel's failure to move to have Petitioner declared incompetent to stand trial (*id.* at 43-46).

To successfully make an ineffective assistance of counsel claim, Petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1994).  As Magistrate Judge Berg explained, this requires Petitioner demonstrate "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and the deficient performance deprived defendant of "a fair trial, a trial whose result is reliable." *Id.* at 687.  In other words, Petitioner must demonstrate "the challenged action

cannot be reasonably considered sound trial strategy under the circumstances of the case." *Lord v. Wood.,* 184 F.3d 1083, 1085 (9th Cir. 1999).

Additionally, Petitioner must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

"Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other." *Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir. 2002). *See also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the grounds of lack of sufficient prejudice, … that course should be followed.").

### 1. Claim One: Trial Counsel Provided Ineffective Assistance of Counsel by Not Investigating and Presenting a Mental-Health Based Defense.

Petitioner argues that his Sixth Amendment right was violated by the ineffective assistance he received when his trial counsel, Kelley, failed to investigate, and then present, a mental-health based defense at trial. (FAP at 26.) Petitioner asserts that Kelley performed deficiently by failing to investigate his mental health when the facts Kelley knew or should have known, along with statements made by himself and his family members, medical, educational and court records, and the crime itself, raised the possibility of a mental-health-based defense. (*Id.* at 26-31.) Further, Petitioner claims he was prejudiced by trial counsel's decision to not present a mental-health based defense. In Petitioner's view, Kelley went to trial on a weak self-defense claim and he contends, if Kelley had presented a mental-health defense, the jury's understanding of the case would have fundamentally changed. (*Id.* at 31-34.)

In his objections, Respondent states that the magistrate judge was mistaken in failing to adequately defer to the reasonable tactical decisions of counsel based on what counsel knew at the time. (Doc. No 179 at 5.) Respondent argues that Petitioner has not met his burden to either show that Counsel's performance was deficient or resulted in prejudice.

3:09-cv-1896 JM (MSB)

(*Id.* at 6-15.)  However, the court agrees with Magistrate Judge Berg that Petitioner has met his burden of demonstrating both.

As correctly noted by Magistrate Judge Berg, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*  Whether counsel's actions are reasonable "may be determined or substantially influenced by the defendant's own statements or actions." *Id.*  The Supreme Court has provided some guidance on the subject by furnishing the following examples:

> when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether.  And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Id.*

Moreover, the Ninth Circuit has cautioned that "a tactical decision may constitute constitutionally adequate representation even if, in hindsight, a different defense might have fared better."  *Bemore v. Chappell*, 788 F.3d. 1151, 1163 (9th Cir. 2015) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995).  Thus, determining "[w]hether performance was deficient is a fact-specific inquiry; '[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'"  *Id.*  (quoting *Strickland*, 466 U.S. at 688-89).  Prevailing professional norms can provide insight into what it means to provide reasonably competent assistance. *See id.*  The Restatement of Professional Standards can be a useful guide for determining reasonableness "to the extent they describe the professional norms prevailing when the representations took place."  *Doe v. Ayers*, 782 F.3d 425, 434 (9th Cir. 2015) (citation omitted).

As Magistrate Judge Berg explained, in 1995 the applicable ABA Standards for Criminal Justice required "[d]efense counsel . . . conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." (R & R at 27 citing *Brodit v. Cambra*, 350 F.3d 985, 1006 (9th Cir. 2003) (citing ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993)). "The commentary to the standards made clear that 'information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like will be relevant….'" *Ayers*, 782 F.3d at 434 (quoting *Bobby v. Van Hook*, 558 U.S. 4, 7-8 (2009)).

### i.   Analysis

Petitioner was convicted of second degree murder.  As Magistrate Judge Berg accurately detailed, in California "[s]econd degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." *People v. Elmore*, 59 Cal. 4th 121, 133 (2014) (quoting *People v. Knoller*, 41 Cal. 4th 139, 151 (2007)).[5]  "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." *Elmore*, 59 Cal. 4th at 133.  "'[O]ne who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.'" *Id.* at 134 (quoting *People v. Flannel*, 25 Cal. 3d 668, 672 (1979)).  Unreasonable self-defense is based on a defendant's

---

[5] Malice aforethought may be express or implied.  *Elmore*, 59 Cal. 4th at 132.  Express malice means that a defendant "must intend to act unlawfully, or in other words, have a wrongful intent." *Id.* at 133.  "Malice is implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." *Id.* (citing CAL. PENAL CODE § 188) "Manslaughter, a lesser included offense of murder, is an unlawful killing without malice. *Id.* (citing CAL. PENAL CODE § 192; *People v. Thomas*, 53 Cal. 4th 771, 813 (2012)).

assertion that he lacked malice and acted on the belief that he needed to defend himself. *Id.* at 136. *See also In re Christian S.*, 7 Cal. 4th 768, 771 (1994) ("Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant actually, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.").

Here, while Petitioner conceded that he killed the victim, his counsel sought to establish and argue imperfect self-defense to the jury.[6] Ordinarily, a defendant may present "evidence of mental disease, defect, or disorder to support a claim of unreasonable self-defense based on mistake of fact." *Elmore,* 59 Cal. 4th at 146. But Petitioner argues that Kelley never investigated his state of mind, including his mental-health struggles.

### ii.   Petitioner met his burden of showing deficient performance

Petitioner contends that Kelley's performance was deficient because a reasonable investigation into any potential defense would have revealed his mental-health issues, and that Kelley was on 'notice' of his serious mental-health issues. (FAP at 28-29.) Petitioner argues that Kelley "never investigated [Petitioner's] mental health and whether his mental

---

[6] Because imperfect self-defense involves a misperception of objective circumstances, it is unlike diminished capacity and "is not rooted in any notion of mental capacity or awareness of the need to act lawfully." *Elmore,* 59 Cal. 4th at 134-35. The California Supreme Court has explained the difference as:

> A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an objective correlate. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind.

*Elmore*, 59 Cal. 4th at 137.

health (exacerbated by his drug use) might have contributed to [Petitioner] having a genuine, albeit unreasonable, belief in the need to defend himself from High." (*Id.* at 29-30.) Further, Petitioner argues Kelley's decision not to conduct an investigation into a client's mental health cannot be viewed as reasonable, especially when that client was showing signs of mental-health issues. (*Id.* at 30.)

The Ninth Circuit has cautioned that, "'the Supreme Court has repeatedly made plain that counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Weeden v. Johnson*, 854 F.3d 1063, 1069 (9th Cir. 2017) (internal citations omitted) "Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired." *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003).

In the case at bar, the record regarding what, if any, investigation Kelley performed, is sparse. As Magistrate Judge Berg explained, "[t]he parties' stipulation as to Mr. Kelley's testimony sheds no further light on Kelley's actual decision making in Petitioner's case." (R & R at 30; *see also* Doc. No. 173). The record does, however, make clear that a mental health defense was possibly available, yet Kelley did not investigate that defense. *See Porter v. McCollum*, 558 U.S. 30, 40 (2009) (in light of the potentially exculpatory psychological evidence, counsel's failure to investigate "ignored pertinent avenues for investigation of which he should have been aware."); *see also Phillips v. Woodford*, 267 F.3 966, 976 (9th Cir 2001).

The record illustrates that neither the defense investigator nor trial counsel ever interviewed any potential witnesses regarding Petitioner's history of mental health issues or drug abuse. (*See* FAP, Ex. A at A20, A30, A41.) The available record also reveals that aside from interviewing Petitioner's wife, Joyce Ann Richmond, (*see id.* at A18-21), no members of the defense team made any effort to visit and interview Petitioner's family members and friends in an attempt to obtain information on Petitioner's background and upbringing. (*See id.* at A29-30, A31-32, A40-41.) This conclusion is supported by Kelley's own testimony, wherein he stated that "typically, he did not care what the

defendant or family member said because he knew what his job was in defending a case." (Doc. No. 173 at 3.) Similarly, it does not appear that any effort was made to gather school records about Petitioner. Had anyone bothered to do so, they would have learned about Petitioner's history of childhood abuse, that he struggled in school and failed second grade[7], with subsequent testing revealing that Petitioner has an IQ of 57, placing him squarely in the mentally retarded range. (FAP, Ex. C at C2, C67.) All this information would have been highly relevant at both phases of Petitioner's trial.

Moreover, the available record shows little, if any, investigation regarding Petitioner's drug addictions, or any record of his mental health history since childhood or adolescence. The only indication that Kelley considered Petitioner's drug use is a notation indicating the defense investigator consulted with Dr. Ornish, who holds a "Diplomate American Board of Psychiatry and Neurology with Added Qualifications in Forensic Psychiatry," for one-hour regarding methamphetamines. (Doc. No. 173 at 3.) Kelley himself recently declared he "has no recollection of Dr. Ornish," although he does "recall that there was some information that Jones had a history of drug use." (*Id.* at ¶ 15.) In his objections, Respondent contends Kelley had a practice of considering mental health defenses as part of a murder case because it might reduce culpability and the consultation between the defense investigator and Dr. Ornish "confirm[s] that mental health issues relating to a possible mental health defense were necessarily explored and considered, and thus counsel was not deficient." (Doc. No. 179 at 7). But as Magistrate Judge Berg explained, these records do not suggest "that Mr. Kelley consulted with Dr. Ornish about

---

[7] As the declaration filed in support of the FAP from Dr. Gregory Woods notes, Petitioner's "academic records are consistent with a life-long, developmental course of cognitive deficits, consistent with an impaired brain long before he became involved in drug use or came to prison." (FAP, Ex C at C2, ¶ 4.) Similarly, Dr. Stacey Wood reports Petitioner "presents with an IQ of 57, in the mildly intellectually disabled range (formerly known as mildly mentally retarded). This IQ score is in the 0.2nd percentile, meaning it is worse than 99.8% of the population." (*Id.* at C25, ¶ 3.)

any other aspect of Petitioner's mental condition at the time of the shooting or that Dr. Ornish ever interviewed Petitioner about his mental health history." (R & R at 34.)

Within the same declaration, Mr. Kelley also stated that he was unaware of Petitioner's mental health issues, that he suffered from schizophrenia or that he was on medication, asserting he "never got any of that from Mr. Jones." (Doc. No 173 at ¶ 12.) Kelley's position is directly contradicted by Petitioner's own declaration that he informed Kelley that he had been hearing and seeing things on the day he shot the victim, and that he was on "psych" medications during his meetings with Kelley because he was still hearing voices and seeing things. (*See* FAP Ex. A at A47.) Even if the court views Petitioner's statement as self-serving, Kelley's declaration is especially troubling when one considers that Kelley was aware that while awaiting trial, Petitioner had been held in a padded "safety" cell at the George Bailey Detention Facility and had been prescribed the antipsychotic drug, Mellaril. (*See* FAP Ex. B at B3, B9, B27, B29, B30.) Respondent's contention that Kelley likely disregarded Petitioner's mental-health issues because Kelley chose to accept a prison nurse's diagnosis that Petitioner was "malingering," and that Petitioner did not complain to prison officials again about mental health issues while awaiting trial, (Doc. No. 179 at 10-11; *see also* FAP Ex B. at B13), does not excuse Kelley from his duty to investigate and provides further evidence as to why his decision not to explore further was unacceptable. *See Ayers*, 782 F.3d at 435 ([I]f what counsel knows or should know suggests that further investigation might yield more mitigating evidence, counsel must conduct that investigation.)

Mental health professionals, including prison medical officials and Respondent's expert, Dr. A. Martell, Ph.D., ABPP, (*See, e.g.,* FAP, Ex. C, C65, C70-74; ECF 165-1), have since determined that Petitioner has legitimate mental-health issues and a long history of psychiatric issues.[8] According to Dr. Gregory Woods, hired by habeas counsel,

---

[8] As Magistrate Judge Berg documented, the parties stipulated that the expert reports, "with the exception of Dr. Woods's ultimate conclusion that [Petitioner] in fact had a genuine,

Petitioner is diganosed with: Cognitive Disorder not otherwise specified; psychotic disorder secondary to a general medical condition; post-traumatic stress disorder; methamphetamine abuse in remission; and global cognitive impairments. (*Id.* at C2, ¶ 7.) Dr. Woods notes Petitioner suffers from several psychiatric conditions including schizoaffective disorder, schizophrenia, bipolar disorder, and major depressive disorder. (*Id.* at C2, ¶ 8.) Dr. Woods also reports that there was a genuine possibility that Petitioner was perseverating when he killed High, which is the uncontrollable repletion of a response to a stimulus that is often caused by a brain injury or organic brain disorder. (*Id.* at C68.) He opines:

> Mr. Jones suffers from significant deficits in his executive functioning. This impacts his ability to effectively weigh and deliberate, sequence his thinking and behavior, and causes him to get stuck. Mr. Jones has demonstrated concrete thinking and disinhibition. At times he seems unable to respond in a reasonable manner. His reactions were honest, but unreasonable. His cognitive deficits are captured in his testimony and corroborated by his social history and neuropsychological testing.

*Id.* at C75. Additionally, Dr. Woods submits that Petitioner's cognitive deficits were compounded by his methamphetamine use which enhanced his paranoia. (*Id.* at C69.) Similarly, Dr. Daniel A. Martell reviewed and agreed with Dr. Stacey Wood's conclusions that Petitioner meets diagnostic criteria for Intellectual Disability and suffers from neuropsychological impairments in multiple areas including executive functioning, memory, attention and visual processing. (Doc. No. 165-1 at 2.) Further, Dr. Martell agrees with Dr. George Woods's conclusion that Petitioner has a history of suffering from mental illness, including schizophrenia, schizoaffective disorder, depression, and PTSD, and with Dr. Woods's opinion that Petitioner's chronic methamphetamine use would have further served to undermine his intellectual and cognitive deficits, potentially exacerbating

---

albeit unreasonable, belief in the need to defend himself. That conclusion can be found at Exhibit C65 and C73. This Court, however, can consider Dr. Woods's opinions that led him to that conclusion." (Doc. No. 174 at 2-3.)

his psychiatric symptoms. (*Id.* at 2-3.) Finally, Dr. Martell opines that Dr. Woods's finding that Petitioner's behavior during the instant offense reflected frontal lobe dysfunction and "perseveration," while speculative, is not out of the realm of possibility and as such may have been helpful to the trier-of-fact at trial. (*Id.* at 3.) Thus, as Magistrate Judge Berg outlined, "both Petitioner's mental expert (Dr. Woods) and Respondent's expert (Dr. Martell) are in accord that the defense of imperfect self-defense also was potentially available based on Petitioner's mental condition at the time of the shooting," (R & R at 31.) These concurring opinions underscore the objective unreasonableness of Kelley's failure to investigate Petitioner's mental history and mental condition at the time of the shooting, explore the possibility of presenting a mental-health based defense, or present one at trial.

Finally, Respondent contends Magistrate Judge Berg did not adequately consider the information known to counsel at the time of trial and that this information informed Kelley's decision regarding whether a mental health defense was worth further pursuing. (Doc. No. 179 at 8.) Specifically, he points to Kelley's ability to hear the recording of the statement Petitioner gave to the police two weeks after the shooting, claiming it provides a justification for the discounting of the need to investigate a mental health defense. According to Respondent, "[a]t least by a cold reading of the transcript, no mental disorder was apparent in light of Petitioner's detailed recall of the incident, his ability to coherently answer questions, and most tellingly, the absence of any claim of hallucinations, paranoia, or symptom of psychosis." (*Id.* at 9.) Respondent also points to the absence of any reference to Petitioner's mental health problems or methamphetamine use in the statements his wife gave to the police, and to a probation officer when compared to the declaration she supplied to this court. (*Id.* at 9-10.) Additionally, Respondent argues that Petitioner's pretrial, trial and post-trial testimony make no reference to paranoia, hallucinations, or give any indication that he was not in his right mind at the time of the killing. (*Id.* at 12-13.) But as *Strickland* and its progeny make clear, counsel's investigation must determine strategy and not the other way around. *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003)

(The "deference owed [to] strategic judgments" to pursue one trial strategy and not an alternative is "defined ... in terms of the adequacy of the investigations supporting those judgments."). *See also, e.g., Weeden*, 854 F.3d at 1070 ("Counsel cannot justify a failure to investigate simply by invoking strategy. The Supreme Court has squarely rejected the attempt to justify a limited investigation as reflecting a tactical judgment.") (internal quotations and citations omitted). As discussed, Kelley failed to make a reasonable investigation into Petitioner's mental health issues and history of drug use. By not investigating the contours of a potential mental health defense, Kelley was not able to determine if the defense was viable, or, whether it was more promising than the alternate imperfect self-defense theory. Therefore, his decision not to put on a mental health defense cannot be considered a product of a strategic decision because, "[a]n uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008).

Petitioner has demonstrated that Kelley's decision to not pursue a possible mental health defense was based on an inadequate investigation, and that the decision cannot be considered strategic. *See Bemore* 788 F.3d at 1165-66 (counsel's choice to not present a defense can "hardly be said to [be] a strategic choice" worthy of deference when "s/he has not yet obtained the facts on which such a decision could be made.") (internal citations omitted). Most, if not all, of the information outlined above was readily available to Kelley at the time and reveals the possibility that Petitioner was so mentally impaired as to be unable to possess the requisite intent to commit the crimes. *See Wiggins*, 539 U.S. at 521. Accordingly, the court concludes that counsel's performance was deficient because he failed to investigate petitioner's mental health, a failure highlighted by his later inability to justify not considering it. Thus, the court agrees with Magistrate Judge Berg that Petitioner met his burden of showing deficient performance.

### iii.    Petitioner met his burden of showing prejudice

Under *Strickland*, prejudice is established when "it is 'reasonably likely' the result would have been different." *Harrington v Richter*, 562 U.S. 86, 111-12 (2011). When a

petitioner claims counsel's error was a failure to investigate, demonstrating *Strickland* prejudice requires showing both a reasonable probability that counsel would have made a different decision had he investigated, and a reasonable probability that the different decision would have altered the outcome.  *Bemore,* 788 F.3d at 1169 (citing *Wiggins* 539 at 535-36).

To prevail on a mental health defense, Petitioner "would have to prove either that 'because of his mental illness or voluntary intoxication, he did not in fact form the intent unlawfully to kill.'"  *Bemore,* 788 F.3d at 1169 (quoting *The People v. Saille*, 54 Cal. 3d 1103, 1117 (1992)).

The evidence supporting a mental health defense Petitioner offers includes expert testimony from Dr. Gregory Woods and Dr. Stacey Wood outlining the serious mental health issues he was suffering at the time of the offense, including a cognitive disorder, life-long psychotic symptoms, and methamphetamine-related psychosis.  As Magistrate Judge Berg reported:

> these disorders not only clouded Petitioner's thinking, but some had led him since childhood to hear and see things that were not there; that Petitioner suffered from profound cognitive dysfunction (i.e., that his brain was tragically damaged and had been since his childhood); that Petitioner consequently "perseverates"- he "gets stuck on a word or idea," meaning he struggles to move on from a stimulus once it ceases and also struggles to quickly process changing circumstances; and that Petitioner's judgment and thought process would have been further clouded from the methamphetamine he had been using for the preceding ten days.

R & R at 37.  Such defense expert testimony "would have added an entirely new dimension to the jury's assessment" of the critical issue of Petitioner's mens rea.  *Weeden*, 854 F.3d at 1070, 1072 (finding expert testimony regarding the effect of the defendant's youth would have added an "entirely new dimension to the jury's assessment" of the defendant's mental condition and its decision regarding whether she had the requisite mens rea.)  Here, as Petitioner suggests, a mental health defense "would have given the jury the compelling reason why Mr. Jones (unlike a typical person) could have genuinely, though unreasonably,

believed that a man lying on the ground with a bullet in his back posed a threat." (Doc. No. 180 at 33.)

Not only is Petitioner's argument persuasive, Respondent's expert, Dr. Martell, concluded to a reasonable degree of psychological certainty that Dr. Woods's "finding that [Petitioner's] behavior during the instant offense reflected frontal lobe dysfunction and 'perseveration' while speculative, is not out of the realm of possibility and as such may have been helpful to the trier-of fact at trial." (Doc. No. 165-1 at 3.) Finally, Petitioner has provided declarations from family members attesting to his lifelong history of hearing and seeing things. (*See* FAP, Ex. A14, A18-20, A31-32, A40-41.) Taken together, this evidence of Petitioner's mental health and drug issues could have been used by an attorney to raise reasonable doubt about Petitioner's ability to form the requisite intent to justify a second-degree murder conviction. *See Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th Cir. 2001) (defendant prejudiced by counsel's failure to undertake an appropriately diligent investigation and not opt for a mental health defense strategy, and concluding that it was reasonably probable that had evidence of mental health and drug abuse been introduced, it would have raised reasonable doubt as to his ability to form the intent required for a murder conviction); *Elmore*, 59 Cal. 4th 121, 325 P.3d at 958, 960-61 (petitioner misperceived "objective circumstances" because of a mental illness, cognitive dysfunction, and drug use). As explained in the R & R:

> but for Mr. Kelley's deficient performance in failing to investigate and present a mental-health based defense, there is a reasonable probability that at least one juror would have been persuaded that Petitioner only was guilty of manslaughter based on an imperfect self-defense theory as opposed to second degree murder.

R & R at 39.

Based on a review of the record and the materials proffered by Petitioner in support of a mental health defense, the court is persuaded that there is "a reasonable probability that, but for counsel's unprofessional errors" in failing to present this defense at trial, "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. *See also*

*Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

### iv.   Conclusion regarding Claim One

In sum, Petitioner has overcome *Strickland's* high bar and demonstrated that his trial counsel's failure to conduct an adequate investigation or present a mental-health based defense, was unreasonable.  Further, Petitioner has demonstrated that he suffered sufficient prejudice to warrant setting aside his sentence.   Accordingly, the court rejects the Respondent's objections, adopts the R & R, and grants the petition as to Claim One.

### 2.  Claim Two: Trial counsel provided ineffective assistance by not moving to have Petitioner declared incompetent to stand trial.

Petitioner's second claim argues that he received ineffective assistance of counsel because Kelley failed to move to have him declared incompetent to stand trial.  (FAP at 43-46.)  First, he contends there were multiple "flashing red signs" that no reasonable attorney should have missed that illustrated Petitioner was not competent to stand trial. Second, Petitioner claims there is overwhelming evidence to support his contention that his mental health issues, methamphetamine use, and cognitive dysfunction subjected him to serious limitations at the time of trial, leaving him unable to reasonably assist Kelley in his defense.  In support of Claim Two, Petitioner primarily relies on the report of Dr. Woods.  (FAP, Ex. C at C73-74.)

A defendant is competent to stand trial if he has "a rational as well as a factual understanding of the proceedings against him," along with "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." *Dusky v. U.S.*, 262 U.S. 402, 402 (1960) (per curiam); *see also Clark v. Arnold*, 769 F.3d 711, 729 (9th Cir. 2014); *Deere v. Cullen*, 718 F.3d 1124, 1144 (9th Cir. 2013).  As Magistrate Judge Berg explained, "[c]ompetence has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993).  Moreover, as Magistrate Judge Berg accurately recounted, the Ninth Circuit has considered the following factors when determining whether there was a

reasonable probability that the defendant would have been found incompetent: (1) the reports of all the mental health experts; (2) the nature of personal interactions between the defendant and the trial judge, to consider whether these showed lucid, appropriate responses to questions and established the defendant's understanding of the proceedings and ability to consult with counsel; (3) the actions and opinion of defense counsel regarding defendant's competency; (4) whether the prosecutor believed the defendant to be competent; (5) whether the facts of the crime suggested "someone out of touch with reality;" and (6) whether the trial transcripts illustrate the defendant "actually understood what was going on." *Deere* 718 F.3d at 1145-46.

As the R & R made clear, the trial transcripts clearly illustrate that Petitioner understood what was occurring during the trial and provided no instances where Petitioner disrupted the trial or acted in a peculiar manner. (R & R at 12-16, 18-19.) And, as recounted in the R & R, Petitioner's police interviews provided further support for this conclusion. (*Id.* at 17.) The R & R also noted the absence of any notations in the files of Mr. Lester, the public defender originally appointed to represent Petitioner, Kelley, or Petitioner's criminal history record indicating a concern regarding Petitioner's competency to stand trial. (*Id.* at 19-20.) The R & R also considered the prosecutor's position regarding Petitioner's competency to stand trial and drew the reasonable inference that no prosecutor had ever appeared to doubt Petitioner's competency. (*Id.* at 21.)

Finally, Magistrate Judge Berg weighed all the retrospective mental health expert reports and contemporaneous records before concluding that the he did not find the report of Dr. Woods to be persuasive on the issue of Petitioner's competence. Relying on Petitioner's contention that he became "increasingly paranoid" and "with[drew] from his trial," (FAP, Ex. C at C74), and his own interpretation of Petitioner's trial testimony, (*id.*), Dr. Woods opined that Petitioner was "unable to reasonably assist his attorney in his defense at the time of his tr[ia]l." (*Id.* at C74.) However, Magistrate Judge Berg concluded:

> First, Dr. Woods cherry-picks a small segment from Petitioner's trial testimony, which as set forth above, overall demonstrates that Petitioner

clearly understood the nature and object of the proceedings against him. Petitioner testified coherently and spoke in complete, responsive sentences. He was also a reliable historian, spatially aware (e.g., he could easily identify issues and explain photographs and locations), and did not appear to have memory issues.  In addition, Petitioner had a detailed recollection of the night of the shooting, and he set forth his specific version of the events.  Moreover, throughout his testimony, Petitioner demonstrated that he understood what was happening at the trial and was able to follow the testimony of the other witnesses.  Petitioner also was able to understand and follow the questions being asked, and demonstrated an understanding of nuance.

R & R at 25.

The court agrees with Magistrate Judge Berg's determination that "although the facts of the crime did suggest 'someone out of touch with reality,' in the Court's view it does not follow from this one <u>Deere</u> factor that Petitioner lacked the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense."  (Id.)  Furthermore, this court concurs with Magistrate Judge Berg's conclusion that Petitioner has failed to make the requisite showing that he would have been found incompetent to stand trial had his trial counsel moved for such a declaration.  The court, therefore, adopts the R & R and denies the FAP as to Claim Two.

## III.   CONCLUSION

In accordance with the above, the court hereby: (1) adopts the R & R in full; and (2) rejects Respondent's objections.

The Amended Petition for Writ of Habeas Corpus is **DENIED** as to Claim Two. The Amended Petition for Writ of Habeas Corpus is **GRANTED** as to Claim One.  (Doc. No. 141.)  Petitioner shall be discharged of all consequences of his second degree murder conviction in San Diego Superior Court Case No. ECR11253 unless either (a) he is brought to trial and retried on the second degree murder charge within sixty (60) days or such additional time as state law allows, or (b) the judgment of conviction in San Diego Superior Court Case No. ECR11253 is reduced from second degree murder to manslaughter and petitioner is resentenced accordingly (including on the personal use of a firearm enhancement) with credit for time served.

21

1    The parties shall file a joint status report with the court within 75 days of this order.

2    The Clerk of Court is directed to **CLOSE** this case.

3    IT IS SO ORDERED.

4    Dated:  October 19, 2020

5

6    Hon. Jeffrey T. Miller
     United States District Judge